655 A.2d 1368

ABTRAX PHARMACEUTICALS, INC., T/A SUMMIT HILL LABORA-TORIES, PLAINTIFF–RESPONDENT AND CROSS–APPEL-LANT, v. ELKINS–SINN, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued January 3, 1995—Decided April 10, 1995.

*Timothy J. Hinlicky* argued the cause for appellant and cross-respondent (*Parker, McCay & Criscuolo*, attorneys; *Stacy L. Moore, Jr.*, on the brief).

*Bernard F. Conway* argued the cause for respondent and cross-appellant (*Mr. Conway*, attorney; *Kevin Weinman*, on the brief).

The opinion of the Court was delivered by

STEIN, J.

The issue before us is whether a complaint should be dismissed pursuant to *Rule* 4:23–2(b)(3) for discovery misconduct consisting of the willful concealment of relevant documents. The Law Division found that plaintiff's conduct was contumacious, dismissed plaintiff's complaint with prejudice, and awarded counsel fees and expenses. In an unreported opinion, the Appellate Division agreed with the finding that plaintiff had willfully concealed relevant documents, affirmed the award of counsel fees and expenses, but reversed the trial court's dismissal of the complaint. We granted certification, 137 *N.J.* 314, 645 *A.*2d 142 (1994), and now hold that the trial court properly exercised its discretion in dismissing Abtrax's complaint. As a result, we reverse in part the judgment of the Appellate Division and reinstate the judgment of the Law Division dismissing the complaint.

I

Plaintiff Abtrax Pharmaceuticals, Inc., (Abtrax) is a wholesaler of veterinary supplies located in Navesink, New Jersey. Charles

W. Rahner, Jr., the company's president, owns ninety-nine percent of Abtrax's stock. In August 1969, defendant, Elkins–Sinn, Inc. (Elkins), agreed to package a veterinary product developed by Abtrax called Gecolate, an intravenous muscle relaxant for horses. Rahner and Elkins developed techniques for sterilizing the Gecolate powder and packaging it so that sterile water could be added before use. Abtrax holds the patent for that process. Production began in 1972 when the Food and Drug Administration approved Abtrax's New Animal Drug Application. By 1974, Abtrax began marketing the product.

In February 1982, Elkins informed Abtrax that it would stop producing Gecolate powder. In 1984, A.H. Robins, which became Elkins's parent company after the initial production of Gecolate powder, began to market Guailaxin, a competing product. Although Rahner claims that he was unsuccessful in finding an alternative manufacturer, since 1987 Vet Labs, Inc. has been producing Gecolate injection for Abtrax, a solution form of the product that Abtrax bought from another company.

In December 1985, Abtrax filed a three-count complaint alleging that Elkins had breached its contract by ceasing to manufacture Gecolate powder without sufficient notice to permit Abtrax to find a new manufacturer (counts one and two). Abtrax further alleged that Elkins had revealed trade secrets to competing manufacturers (count three). Elkins filed an answer and requested production of documents relating to Abtrax's claims. In April 1986, Abtrax responded to Elkins's request by stating, "we have not yet been able to do an accurate calculation of damages although the same will be supplied to you as soon as it is available to us."

After repeated efforts to obtain answers to interrogatories and production of documents relating to Abtrax's alleged damages, Elkins received answers to its interrogatories in November 1986. However, in respect of Elkins's request for copies of correspondence concerning Abtrax's attempts to find other manufacturing sources, Abtrax responded: "to be supplied." Abtrax did not produce the documents that Elkins had requested. After further requests for the production of the documents had proved unavailing, Elkins moved pursuant to *Rule* 4:23–5(a) to dismiss Abtrax's

complaint because timely answers to interrogatories had not been served.

The Law Division denied Elkins's motion, but permitted Elkins's counsel to inspect the requested documents at Abtrax's office. At a discovery session for document production held on February 25, 1987, Abtrax made available inventory sheets, price lists, raw-material costs, and a summary of taxable income, but Abtrax did not produce purchase orders, sales invoices, tax returns, and financial statements. Elkins's counsel certified that Abtrax's former counsel had "advised [him during the document production] that Mr. Rahner did not have sales invoices or purchase orders concerning the Gecolate powder insofar as [they] were either lost or destroyed in a flood at Plaintiff's business premises sometime earlier," noting, however, that Abtrax's former counsel "did agree to make further inquiry into this and provide me * * * with at least representative invoices or whatever additional records could be found." However, Abtrax's former counsel, at his deposition in February 1991, testified:

> I don't think I made a statement to that effect. * * * It's possible that something like that was discussed. I believe there may have been a discussion about a flood or records being discussed * * *. [Rahner] may have said there was a destruction of the sales invoices, but not that they were all destroyed.

Moreover, according to Abtrax's former counsel, Elkins's counsel had stated at that document-production session that those documents Abtrax had produced were "exactly what I wanted."

Shortly after the February 25, 1987, production of documents, Elkins's counsel requested by letter that Rahner bring to his deposition scheduled for March 10, 1987, "[r]epresentative copies of billing receipts to [Gecolate-powder] customers 1980, 1981, and 1982, or as best as can be produced." Prior to being deposed, Rahner produced certain financial records, correspondence, inventory sheets, invoices, and purchase orders. At his deposition, Rahner was asked whether he had "produced * * * everything [he had] in the matter," and he responded, "Yes." On further questioning, Rahner stated that he had "[p]roduced everything that was requested." However, Rahner produced copies of the billing receipts of Gecolate-powder sales only for the years 1982

through 1984, whereas Elkins had specifically requested production of the records for the period 1980 through 1982.

In May 1987, Abtrax moved to file an amended complaint to add two counts alleging (1) that Elkins had breached an agreement regarding the use of Abtrax's powder-filling machine, and (2) that Elkins had converted the machine for its own use and the use of its parent company, A.H. Robins. Because that motion had been denied, Abtrax filed a new complaint in June 1987, repeating the three counts in its initial complaint and adding the new counts. By order dated August 14, 1987, the court dismissed without prejudice the original complaint and ordered all completed discovery to be applied to the action initiated by the new complaint.

As the discovery process continued, Elkins attempted to acquire the invoices and purchase orders relevant to Abtrax's sales of Gecolate powder from 1980 to 1982, the years immediately prior to the termination of the agreement between the parties, as well as invoices for all other years through 1986. In February 1988, Elkins filed a notice to produce "[a]ll records, writing, documents, items or other documentation as identified and requested in Defendant's Interrogatories." Elkins's interrogatory question fifty-five read, "State whether you have any files or written documentation whatsoever in any way relating to this law suit [that] you have not produced previously for * * * inspection [and/or] copying." Abtrax responded, "Not to the best of our knowledge. 'Bench Book' will be supplied." Interrogatory question fifty-six stated, "If any such records as requested above exist, describe all such records and if you would do so without an order, attach true and exact copies of same." Abtrax replied, "n/a."

More discovery motions followed, and the trial court issued additional discovery orders. In June 1988, another document-production session took place at Abtrax's office, at which time Abtrax produced financial statements and tax returns but none of the other sales records that had been requested by Elkins.

On August 24, 1988, Rahner was again deposed. Elkins's counsel asked Rahner, "[w]ith respect to those invoices [that] you

gave to me, are they all of the invoices you have?" Rahner responded, "We gave you representative amounts, we couldn't possibly find the invoices. It would take us two years to go through thousands and thousands of invoices over a ten year period." Elkins's counsel further asked, "[w]hat about letters, write-ins, requests, purchase orders, et cetera, for [Gecolate powder] during this period of time [when Abtrax had been out of Gecolate powder]?" Rahner answered:

> We dumped them after a year so we wouldn't hold them after a while. We dumped all purchase orders from distributors.

> \* \* \* \* \* \* \* \*

> We didn't have them after the first nine to twelve months, we didn't hold them. Everybody is on a computer these days, they wouldn't hold anything like that.

Rahner also testified that his wife had dealt with customers and had been responsible for bookkeeping.

On November 4, 1988, Elkins sent a letter to Abtrax demanding more specific answers to interrogatories and specifically referring to question fifty-five and to the documents that previously had been requested but had not been produced. After receiving follow-up telephone calls, Abtrax responded to that demand by letter dated March 27, 1989, stating, "bench book previously provided."

On March 23, 1989, Elkins issued a notice to take Mrs. Rahner's deposition, requesting that Mrs. Rahner "bring the documents on the Rider annexed hereto." The Rider attached to the notice requested production of the following:

> 1. Copies of all financial records in any way pertaining to Gecolate Powder, including but not limited to bills, invoices, purchase orders, receipts for payments made or received, canceled checks, receipts for expenditures, sales orders or sales forms, accounting records or work papers, summaries of sales made, or any other financial or sale records whatsoever for the period 1980 to the present.

> 2. Copies of all financial records in any way pertaining to Gecolate (Glycodex) injectable solution, including but not limited to bills, invoices, purchase orders, receipt for payments made or received, cancelled checks, receipt for expenditures, sales orders or sales forms, accounting records or work papers, summaries of sales made, or any other financial or sale records whatsoever for the period 1980 to present.

On March 28, 1989, Elkins by notice requested production of the documents identified in the Rider.

Mrs. Rahner's deposition did not take place over the next five months because of scheduling difficulties. During that five months, Elkins sent five letters to Abtrax requesting production of the documents that had been requested in the Rider. With Mrs. Rahner's deposition scheduled for August 11, 1989, Abtrax informed Elkins by telephone on August 9, 1989, that it objected "to some of the information and documents requested."

As a result, a case-management conference was held on August 15, 1989. Following that conference, the trial court issued an order on September 5, 1989, requiring that Abtrax produce Mrs. Rahner for her deposition on or before September 8, 1989, and also produce at that time the documents identified in the Rider attached to the notice to take the deposition, and the documents identified in the notice requesting production of documents dated March 28, 1989. The court further ordered that Rahner be available at Mrs. Rahner's deposition to answer any question that she might not be capable of answering.

At Mrs. Rahner's deposition on September 8, 1989, the following exchange occurred between Abtrax's trial counsel and Elkins's counsel:

[Elkins's Counsel]: You're representing to me that there are no other documents pertaining to the [Gecolate] powder than what was produced to us on previous occasions.

[Abtrax's Trial Counsel]: That's correct. · This is everything else today that we have by documentation. There are no other documents.

[Elkins's Counsel]: Everything related to the [Gecolate] powder was provided to us on a prior occasion.

[Abtrax's Trial Counsel]: That's correct.

The trial began more than a year later in December 1990. On December 13, the fourth day of trial, during Rahner's direct examination, Abtrax's counsel displayed one of the "representative samples" of invoices for a sale of Gecolate powder, and asked, "Mr. Rahner, if you were to produce all of the vouchers with regard to the sale of this product would those documents reflect any differ-

ence in the price for the items other than is reflected on these vouchers?" Rahner replied, "No." At that point, Elkins's counsel asked for *voir dire* and, referring to his numerous demands during discovery for sales invoices, expressed surprise that Rahner appeared to have acknowledged the existence of invoices that had not been produced.

Rahner initially contended that he had never stated that the records he had produced were the only pre–1984 invoices he possessed. Elkins's counsel then asked, "Did you at any time represent to us that these documents that were just produced were the only handwritten records or records that you maintained prior to going onto computer that you have?" Rahner responded, "I don't think so," and added, "I don't know. It's hard to say. It's hard to say." Although Rahner explained that many records had been lost in a flood of his prior office in Avalon, New Jersey, he conceded that not all pre–1984 sales records, other than those produced, had been destroyed. On further questioning during *voir dire*, Elkins's counsel also discovered that Abtrax had not produced the sales records and invoices for Canadian sales of Gecolate powder.

The trial court then permitted Elkins's counsel to depose Rahner during the lunch break. Rahner admitted that there were Gecolate sales invoices at his office that had not been produced. Elkins's counsel then moved for an order compelling Rahner to produce the sales records he had not yet produced, including the remaining invoices and records for Canadian sales. The court adjourned the trial and directed the attorneys to continue with discovery, the examination of files to be conducted in the presence of counsel.

That same day, counsel for both Elkins and Abtrax went with Rahner to his place of business in Navesink. At the warehouse, counsel located approximately fifty to sixty boxes of pre–1984 invoices that included sales records for Gecolate powder. Rahner denied that any records were stored elsewhere, but his attorney insisted that they look in Rahner's house. Counsel found fourteen

boxes of labeled business records in Rahner's attic. A search of the records by attorneys for both parties revealed that the boxes contained relevant sales records for the period from 1979 to 1981, including sales invoices, purchase orders, and telephone solicitations for Gecolate powder. On returning to Abtrax's office, Abtrax's trial counsel remarked to Elkins's counsel, "Charlie [Rahner] is now having to do what he didn't want to do for the past 2 years."

The trial resumed on December 17, 1990, and Elkins's attorney moved pursuant to *Rule* 4:23–2(b)(3) to dismiss the complaint for failure to comply with discovery orders. During argument, Abtrax's trial counsel conceded: "There is no question the court order [to produce those documents identified in the Rider and in the notice to produce] was not complied with." Moreover, in response to the court's question whether the prior understanding had been that "everything had been disclosed," Abtrax's trial counsel answered, "No dispute about that at all."

Observing that it was "considering what appears to be a very serious abuse of [the discovery] process," the trial court found "undisputed that [Rahner had] concealed the fact that he had many documents that he didn't disclose to [Elkins] or to this Court." The trial court stated that it was "of no moment whatsoever that the documents now reveal[ed] may fully substantiate prior representations," because Rahner's "determination [about] what constitute[d] 'representative' documentation [was] not even based on his own review of his existing documentation." Moreover, it concluded that Rahner had made false statements under oath and thus failed "to obey the Court's order." The trial court therefore granted defendant's motion to dismiss pursuant to *Rule* 4:23–2(b), and awarded Elkins counsel fees and expenses incurred in respect of preparation for and attendance at trial, in addition to such other counsel fees and expenses that the trial court deemed appropriate.

After a substitution of counsel, Abtrax moved for reconsideration of the dismissal order. The court heard arguments on March

5, 1991, and June 13, 1991, and entered an order denying Abtrax's motion on December 23, 1991. In a letter opinion setting forth factual findings and legal conclusions, the trial court held that plaintiff's disobedience of discovery orders and false deposition testimony constituted contempt of court punishable by summary dismissal of the complaint and an award of counsel fees and expenses. Reiterating that it was relying on its inherent contempt power, the trial court noted that it was not summarily punishing Abtrax without the right to counsel as a court may do where the "essential elements of the misconduct undermined the court's authority and obstructed orderly administration of justice." Rather, the court noted that it "has extended the right to counsel and has allowed extensive argument and has done a review of documents on which the finding of contempt was based."

In support of its ruling, the trial court made the following findings: Rahner had denied having received advance notice that Elkins would cease production of Gecolate powder despite proof that Rahner had negotiated with other potential producers of Gecolate; Rahner had testified falsely at his August 24, 1988, deposition that purchase orders for Gecolate powder had been "dumped" after one year; Rahner had never referred specifically to Canadian sales of Gecolate powder, which had resulted in the preparation of expert reports without reference to Canadian sales; and Rahner had never reviewed all the billing receipts for Gecolate powder to determine if the sample receipts produced were "representative." In addition, the court observed that although "some misunderstanding [might have occurred] early in the discovery process regarding what documents were destroyed or lost in a flood in 1984, * * * there could be no misunderstanding" that Rahner had failed to satisfy the November 4, 1988, request for answers to interrogatories, the March 23, 1989 Rider, the March 28, 1989, notice to produce documents requested in the Rider, and the September 5, 1989, Order from the trial court requiring Abtrax to produce the documents requested in the Rider and in the March 28, 1989, notice. The court therefore concluded that

notwithstanding many conferences at which complete discovery was urged by this court, and particularly, despite the September 5, 1989 order, Charles Rahner knowingly and on behalf of [Abtrax], failed to produce documents relevant to this litigation and misled [Elkins]. I find further that Charles Rahner testified falsely and misleadingly, as set forth above[,] and that his conduct was clearly contumacious.

The court added that although the dismissal was justified even in the absence of prejudice to Elkins, Rahner's conduct was significantly prejudicial to Elkins: Elkins would be required to pursue discovery anew; expert reports would have to be redone; Elkins already had revealed its theory of the case; Elkins would have to obtain a new expert for damages because its prior expert was no longer available; and trial preparation would have to be repeated. In respect of counsel fees and expenses, the court stated, "There is clear authority to impose such sanctions for failure to obey a court order."

The Appellate Division affirmed the imposition of sanctions against plaintiff for willful discovery misconduct, but reversed the trial court's dismissal of the complaint with prejudice. In the view of the Appellate Division, the trial court's action should be viewed as the imposition of the sanction of dismissal pursuant to *Rule* 4:23–2(b)(3), even though the trial court characterized its order as one deriving from a court's inherent power to punish for contempt pursuant to *Rule* 4:23–2(b)(4). Thus, it rejected Abtrax's argument that it should remand the matter for an evidentiary hearing to determine whether Rahner's conduct constituted contempt of court within the contemplation of *Rule* 1:10–1 or –2. The Appellate Division emphasized that the trial court's findings were "binding because they [were] amply supported by adequate[,] substantial and credible evidence"; however, it concluded that "[d]ismissal of the complaint with prejudice was too harsh a remedy, notwithstanding Rahner's egregious violation of discovery proceedings on behalf of his corporation." The court was "satisfied that any prejudice suffered to date by defendant [was] capable of being remedied."

Although Abtrax contended before the Appellate Division that it had not willfully disobeyed a discovery order, the only issue presented before this Court by Elkins's Petition for Certification is whether the Appellate Division's reversal of the trial court's dismissal of the action was error. At oral argument, Abtrax moved for leave to file a cross-petition for certification *nunc pro tunc* to raise the issue whether the record supported the trial court's findings. Thereafter, Abtrax filed a cross-petition *nunc pro tunc*, contending that the Appellate Division was not bound by the trial court's findings because the trial court had not conducted an evidentiary hearing to determine if Abtrax's conduct had been deliberate and contumacious. The Court grants both the motion and the cross-petition for certification.

## II

Discovery rules are designed "to further the public policies of expeditious handling of cases, avoiding stale evidence, and providing uniformity, predictability and security in the conduct of litigation." *Zaccardi v. Becker*, 88 *N.J.* 245, 252, 440 *A.2d* 1329 (1982); *see Aujero v. Cirelli*, 110 *N.J.* 566, 573, 580–81, 542 *A.2d* 465 (1988); *Cunningham v. Rummel*, 223 *N.J.Super.* 15, 18, 537 *A.2d* 1314 (App.Div.1988). "The discovery rules were designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments rest upon real merits of the causes and not upon the skill and maneuvering of counsel." *Oliviero v. Porter Hayden Co.*, 241 *N.J.Super.* 381, 387, 575 *A.2d* 50 (App.Div.1990). If the discovery rules are to be effective, courts must be prepared to impose appropriate sanctions for violations of the rules. *Ibid.; cf. Cunningham, supra,* 223 *N.J.Super.* at 18–19, 537 *A.2d* 1314 ("[I]f discovery rules are to have any meaningful effect upon calendar control and early disposition of litigation, they must be adhered to unless, for good cause shown, they are relaxed under *R.* 1:1–2.").

Chief Justice Vanderbilt observed over thirty years ago, "As with all rules it is necessary that there be adequate provisions for the enforcement of the rules [regarding] discovery against those who fail or refuse to comply. Sanctions are peculiarly necessary in matters of discovery[,] and the power to invoke them is inherent in our courts." *Lang v. Morgan's Home Equip. Corp.*, 6 *N.J.* 333, 338, 78 *A.*2d 705 (1951) (construing predecessor to *Rule* 4:23–2(b)). "A trial court has inherent discretionary power to impose sanctions for failure to make discovery, subject only to the requirement that they be just and reasonable in the circumstances." *Calabrese v. Trenton State College*, 162 *N.J.Super.* 145, 151–52, 392 *A.*2d 600 (App.Div.1978), *aff'd*, 82 *N.J.* 321, 413 *A.*2d 315 (1980); *see also Lang, supra*, 6 *N.J.* at 339, 78 *A.*2d 705 (same); *cf. Allegro v. Afton Village Corp.*, 9 *N.J.* 156, 161, 87 *A.*2d 430 (1952) ("It is peculiarly within the sound discretion of the trial court to deal with [the question whether an adjournment should be granted or a complaint should be stricken].").

However, competing policies are involved in disputes over procedural issues. *Aujero, supra*, 110 *N.J.* at 573, 542 *A.*2d 465; *Crews v. Garmoney*, 141 *N.J.Super.* 93, 96, 357 *A.*2d 300 (App.Div. 1976). "The defendant's right to have the plaintiff comply with procedural rules conflicts with the plaintiff's right to an adjudication of the controversy on the merits." *Zaccardi, supra*, 88 *N.J.* at 252, 440 *A.*2d 1329 (citing *Crews, supra*, 141 *N.J.Super.* at 96, 357 *A.*2d 300); *see Georgis v. Scarpa*, 226 *N.J.Super.* 244, 247, 543 *A.*2d 1043 (App.Div.1988); *Jansson v. Fairleigh Dickinson Univ.*, 198 *N.J.Super.* 190, 193, 486 *A.*2d 920 (App.Div.1985). "Because of these competing policies, and because of the varying levels of culpability of delinquent parties, a range of sanctions is available to the trial court when a party violates a court rule." *Zaccardi, supra*, 88 *N.J.* at 252–53, 440 *A.*2d 1329; *see R.* 4:23–2(b); *Aujero, supra*, 110 *N.J.* at 579, 542 *A.*2d 465.

*Rule* 4:23–2(b) authorizes the imposition of sanctions for failing to comply with a court order. It states in pertinent part:

If a party or an officer, director, or managing or authorized agent of a party * * * fails to obey an order to provide or permit discovery, * * * the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(1) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(2) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the introduction of designated matters in evidence;

(3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(4) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

In respect of the ultimate sanction of dismissal, this Court has struck a balance by instructing courts to impose that sanction "only sparingly." *Zaccardi, supra,* 88 *N.J.* at 253, 440 *A.*2d 1329; *see Georgis, supra,* 226 *N.J.Super.* at 250, 543 *A.*2d 1043. "The dismissal of a party's cause of action, with prejudice, is drastic and is generally not to be invoked except in those cases in which the order for discovery goes to the very foundation of the cause of action, or where the refusal to comply is deliberate and contumacious." *Lang, supra,* 6 *N.J.* at 339, 78 *A.*2d 705 (citations omitted); *see Allegro, supra,* 9 *N.J.* at 160–61, 87 *A.*2d 430; *Johnson v. Mountainside Hosp.,* 199 *N.J.Super.* 114, 119, 488 *A.*2d 1029 (App.Div.1985). "Since dismissal with prejudice is the ultimate sanction, it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party, or when the litigant rather than the attorney was at fault." *Zaccardi, supra,* 88 *N.J.* at 253, 440 *A.*2d 1329 (citations omitted); *see Johnson, supra,* 199 *N.J.Super.* at 119, 488 *A.*2d 1029. Moreover, the "imposition of the severe sanction of dismissal is imposed

not only to penalize those whose conduct warrant it, but to deter others who [might] be tempted to violate the rules absent such a deterrent." *Zaccardi v. Becker,* 162 *N.J.Super.* 329, 332, 392 *A.2d* 1220 (App.Div.), *certif. denied,* 79 *N.J.* 464, 401 *A.2d* 221 (1978).

The scarcity of cases ordering dismissal demonstrates that trial courts have heeded our admonition to impose sparingly the ultimate sanction of dismissal. *Cf. Aujero, supra,* 110 *N.J.* at 580, 542 *A.2d* 465 (stating that "[j]udges, no less than lawyers, strain to avoid the ultimate sanction of dismissal of an affirmative claim or striking of a responsive pleading" for failure to answer interrogatories); *Crews, supra,* 141 *N.J.Super.* at 96, 357 *A.2d* 300 (stating that courts are reluctant "to invoke the sanction of dismissal where lesser measures [are] appropriate" for failure to answer interrogatories). However, a party invites this extreme sanction by deliberately pursuing a course that thwarts persistent efforts to obtain the necessary facts. For example, in *Interchemical Corp. v. Uncas Printing & Finishing Co.,* 39 *N.J.Super.* 318, 120 *A.2d* 880 (App.Div.1956), the plaintiff brought suit for unpaid royalties, alleging that the defendant had failed to submit quarterly reports and had refused to permit the plaintiff to inspect and audit the defendant's records. *Id.* at 321, 120 *A.2d* 880. During pretrial discovery proceedings, the court entered three orders directing the defendant to produce named records and books for inspection. *Id.* at 321–23, 120 *A.2d* 880. The defendant's failure to produce the requested books and records led to the plaintiff's propounding and serving interrogatories in an effort to secure the information contained in the documents that had not been produced. *Id.* at 323, 120 *A.2d* 880. After waiting more than four months for answers to the interrogatories, the plaintiff obtained an order directing that the defendant provide answers within thirty days or a default judgment would be entered. *Ibid.* No answer having been provided, the court suppressed the defendant's answer and ordered the plaintiff to proceed to default judgment, after proof of damages. *Ibid.* The Appellate Division "observed that the court had authority to strike the defense and enter default judgment," *id.* at 324, 120 *A.2d* 880, reasoning that

the defendant had "invited the extreme sanction by the course [that] it chose to pursue in the face of plaintiff's persistent efforts to get at necessary facts." *Id.* at 326, 120 *A.*2d 880. It found that the "order * * * was a just one, for the discovery proceedings went to the very foundation of plaintiff's cause of action, and defendant's refusal to comply was deliberate and contumacious." *Ibid.*

Courts have also dismissed a plaintiff's case for the plaintiff's failure to answer interrogatories within a reasonable time. For example, in *Crews, supra,* the Appellate Division affirmed the trial court's denial of the plaintiff's motion to vacate the trial court's dismissal of the complaint and to restore the matter to the trial calendar. 141 *N.J.Super.* at 97, 357 *A.*2d 300. The plaintiff brought a personal-injury action arising out of a motor-vehicle accident, and the trial court dismissed the plaintiff's action for her failure to answer interrogatories within the time prescribed by the Rules. *Id.* at 94–96, 357 *A.*2d 300. Following the service of the dismissal order, the plaintiff failed to communicate with the defendant until approximately eight months later, at which time she submitted to the defendant unresponsive answers to the interrogatories. *Id.* at 95, 357 *A.*2d 300. The plaintiff then moved to vacate the dismissal and to restore the matter to the active trial calendar. *Ibid.* Finding that the plaintiff had been dilatory in failing to respond to her own attorneys' five written communications and that her answers were unresponsive, and observing that the defendant was prejudiced by the lack of early information concerning the plaintiff's medical status, the trial court denied the plaintiff's motion. *Id.* at 95–96, 357 *A.*2d 300. The Appellate Division held that the trial court's denial was not an abuse of discretion. *Id.* at 97, 357 *A.*2d 300.

Likewise, in *Comeford v. Flagship Furniture Clearance Center,* 198 *N.J.Super.* 514, 518, 487 *A.*2d 1257 (App.Div.1983), the Appellate Division determined that refusing to restore the plaintiffs' complaint for failure to answer interrogatories was within the trial court's discretion. There, the plaintiffs failed to answer the

defendants' interrogatories within the time allowed, and the Assignment Judge granted the defendants' motion to dismiss the plaintiffs' complaint. *Id.* at 515, 487 *A.*2d 1257. Approximately eleven months later, the plaintiffs moved to restore their action, maintaining that they had not answered the interrogatories because of their attorney's excusable neglect. *Id.* at 516, 487 *A.*2d 1257. Finding no satisfactory explanation for the protracted delays and for the failure to comply with discovery rules, the Appellate Division held that "the tortuous and extended history of this case warranted the [A]ssignment [J]udge's refusal to restore plaintiffs' complaint." *Id.* at 518, 487 *A.*2d 1257.

### III

This Court in *Rova Farms Resort, Inc. v. Investors Insurance Co. of America,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974), enunciated the standard for review of factual findings and legal conclusions in nonjury cases: "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." " '[O]ur appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.' " *Ibid.* (quoting *Fagliarone v. Township of No. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div.), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963)).

Likewise, the standard of review for dismissal of a complaint with prejudice for discovery misconduct is whether the trial court abused its discretion, a standard that cautions appellate courts not to interfere unless an injustice appears to have been done. *See, e.g., Allegro, supra,* 9 *N.J.* at 158, 161, 87 *A.*2d 430; *Georgis, supra,* 226 *N.J.Super.* at 249, 543 *A.*2d 1043; *Cunningham, supra,* 223 *N.J.Super.* at 19–20, 537 *A.*2d 1314; *Comeford, supra,* 198 *N.J.Super.* at 517, 487 *A.*2d 1257. We recognize that "[t]here is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influ-

enced by the severity of outright dismissal as a sanction for failure to comply with a discovery order." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 *U.S.* 639, 642, 96 *S.Ct.* 2778, 2780, 49 *L.Ed.*2d 747, 751 (1976) (upholding district court's dismissal of plaintiff's action for failure to comply timely with court order to answer interrogatories). However, we are

[ ]sensitive to the legitimate concerns expressed by the trial [court] that if our discovery rules are to have any meaningful impact upon our civil dockets they must be strictly enforced. [Moreover,] we [are] [ ]mindful of the perils and gravitational pull of the slippery slope wherein the efficacy of our rules is destroyed by the gradual cumulation of exceptions. We recognize that imposition of the severe sanction of dismissal is imposed not only to penalize those whose conduct warrants it, but to deter others who may be tempted to violate the rules absent such a deterrent.

[*Jansson, supra,* 198 *N.J.Super.* at 196, 486 *A.2d* 920.]

*See also Zaccardi, supra,* 162 *N.J.Super.* at 332, 392 *A.*2d 1220 (stating that "imposition of the severe sanction of dismissal is imposed not only to penalize those whose conduct warrant it, but to deter others who [might] be tempted to violate the rules absent such a deterrent"); *National Hockey League, supra,* 427 *U.S.* at 643, 96 *S.Ct.* at 2781, 49 *L.Ed.*2d at 751 (stating that "the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent").

■ Abtrax contends, however, that *Rova Farms, supra,* is inapposite because in that case the trial court's judgment was entered after a full hearing on the merits, whereas in this case the trial court refused to hold an evidentiary hearing. As a preliminary matter, we note that an evidentiary hearing is not mandated in this case. *See Nerney v. Garden State Hosp.,* 229 *N.J.Super.* 37, 42, 550 *A.*2d 1003 (App.Div.1988) ("Discovery should be completed before the trial court decides the issue of prejudice and, *if appropriate,* an evidentiary hearing should be held.") (emphasis supplied); *Hirsch v. General Motors Corp.,* 266 *N.J.Super.* 222, 262, 628 *A.*2d 1108 (Law Div.1993) ("However, the *Nerney* court

unequivocally stated that an evidentiary hearing is not mandatory. [Rather, a trial] court must consider whether an evidentiary hearing would be helpful to determine the issue of prejudice to the nondelinquent party."); *cf. Comeford, supra,* 198 *N.J.Super.* 514, 487 *A.*2d 1257 (upholding trial court's dismissal of plaintiff's complaint without conducting evidentiary hearing); *Interchemical Corp., supra,* 39 *N.J.Super.* 318, 120 *A.*2d 880 (upholding trial court's dismissal of defendant's defense without conducting evidentiary hearing).

Rather, courts have required an evidentiary hearing where the record before the trial court has not provided an adequate basis for a fully informed determination of the underlying issue, *Nerney, supra,* 229 *N.J.Super.* at 42, 550 *A.*2d 1003, or where an evidentiary hearing would be helpful for a determination of the issue, *Hirsch, supra,* 266 *N.J.Super.* at 262, 628 *A.*2d 1108. For example, in *Johnson, supra,* 199 *N.J.Super.* at 120, 488 *A.*2d 1029, the Appellate Division remanded the matter for an appropriate hearing because the sparse record was not "wholly informative" regarding the prejudice that the defendants would sustain if the plaintiff's complaint were reinstated. Conversely, in *Hirsch, supra,* 266 *N.J.Super.* at 263, 628 *A.*2d 1108, where there had been extensive discovery, briefing, and oral argument regarding the issue of prejudice, the court found that "an evidentiary hearing [was] not necessary nor helpful to determine the issue of prejudice."

The trial court presided over this matter since December 1988. During the two years prior to trial, excluding telephone management conferences, the trial court conducted at least four in-chamber pretrial/discovery management conferences, including the conference on August 15, 1989, which resulted in the September 5, 1989, discovery order. The trial court sat through four days of trial, heard lengthy arguments on three separate dates regarding the issue of dismissing Abtrax's complaint with prejudice, and reviewed relevant documents. Pursuant to Abtrax's motion for reconsideration, the trial court permitted Abtrax to

engage in further discovery and present any arguments or facts bearing on the discovery-misconduct issue. The trial court also had the benefit of extensive discovery and briefing as well as detailed certifications discussing the case's history. Therefore, we conclude that the trial court did not need to conduct an evidentiary hearing to decide the issue whether Abtrax's complaint should have been dismissed with prejudice. As a consequence, we decline to exercise our power of plenary review to conduct further findings of fact. Nonetheless, in deciding this matter, we have undertaken a comprehensive examination of the record.

 Although Abtrax presents several arguments in an attempt to raise factual discrepancies, this Court need not resolve those issues. Rather, we decide only that the record contains adequate, substantial, and credible evidence in the evidence to sustain the trial court's factual findings, and we will not disturb them. *See Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495. Based on those factual findings, we conclude that the trial court did not err in finding that Abtrax's conduct was deliberate and contumacious. We agree with the Appellate Division's determination that the record before the trial court "overwhelmingly support[ed] [its] conclusion of the willful, deliberate disregard of discovery orders." We further agree with the Appellate Division's view that the trial court's action should be viewed as the imposition of the sanction of dismissal pursuant to *Rule* 4:23–2(b)(3), rather than one deriving from the court's inherent power to punish for contempt pursuant to *Rule* 4:23–2(b)(4).

 Thus, we hold that the trial court did not abuse its discretion in finding deliberate and contumacious conduct and in concluding that the extreme sanction of dismissal was appropriate in this case. In support of its conclusion that dismissal was the appropriate sanction, the trial court observed that Rahner's conduct had significantly prejudiced Elkins's trial preparation, noting that the delayed production of undisclosed documents would require Elkins to conduct additional discovery, obtain revised expert reports, retain a new expert on damages, and engage in additional

trial preparation. The Appellate Division acknowledged that Elkins had been prejudiced, but expressed the view that compensating Elkins for any added counsel fees and expenses incurred due to delay and additional trial preparation would substantially remedy the prejudice caused by Abtrax's discovery violations. We agree that the extent of the prejudice caused by discovery violations and the ability to redress that prejudice are significant factors to be weighed by a trial court in imposing sanctions for discovery violations. *Zaccardi, supra,* 88 *N.J.* at 253, 440 *A.*2d 1329; *Crews, supra,* 141 *N.J.Super.* at 96, 357 *A.*2d 300; *cf. Aujero, supra,* 110 *N.J.* at 577, 542 *A.*2d 465 (stating that in determining whether to relax Court Rules, one " 'important factor[ ]' " is " 'the prejudice that would accrue to the other party' ") (quoting *Jansson, supra,* 198 *N.J.Super.* at 195, 486 *A.*2d 920).

In exceptional circumstances, however, interests other than prejudice can shift the balance in favor of dismissal as a sanction. Although the discovery rules generally are viewed as establishing specific guidelines for the conduct of trial preparation, their underlying purpose is to assure full disclosure of all material facts and documents to the parties, to the end that the trial will serve the ends of justice rather than function as a trap for the unwary. *See Oliviero, supra,* 241 *N.J.Super.* at 387, 575 *A.*2d 50. A litigant that deliberately obstructs full discovery corrupts one of the fundamental precepts of our trial practice—the assumption by the litigants and the court that all parties have made full disclosure of all relevant evidence in compliance with the discovery rules. A litigant who willfully violates that bedrock principle should not assume that the right to an adjudication on the merits of its claims will survive so blatant an infraction. Wholly apart from the prejudice caused by Abtrax's discovery violations, the conclusion is inescapable that Abtrax's failure to comply with discovery demands and orders, if undetected, would have afforded Abtrax an unfair advantage at trial, because of Abtrax's familiarity with facts and documents that had never been disclosed to Elkins. Prevention of such an unfair advantage is a basic premise of our

discovery rules. On this record, we are fully satisfied that the sanction of dismissal imposed by the trial court was justified.

## IV

We reverse the judgment of the Appellate Division reinstating Abtrax's complaint, and affirm the judgment of the Appellate Division in respect of the trial court's award of counsel fees and expenses.

*For reversal in part; affirmance in part*—Chief Justice WILENTZ and Justices HANDLER, STEIN, POLLOCK, O'HERN, GARIBALDI and COLEMAN—7.

*Opposed*—none.