31 A.3d 623 (2011)
423 N.J. Super. 140
NEWARK MORNING LEDGER CO., Publisher of the Star-Ledger, Plaintiff-Respondent,
v.
NEW JERSEY SPORTS & EXPOSITION AUTHORITY, Defendant-Appellant.
No. A-1810-10T1
Superior Court of New Jersey, Appellate Division.
Argued September 14, 2011.
Decided November 30, 2011.
*626 Steven R. Klein argued the cause for appellant (Cole, Schotz, Meisel, Forman & Leonard, P.A., attorneys; Mr. Klein and *627 Michael S. Weinstein, of counsel and on the briefs; Victoria Cioppettini, Hackensack, on the briefs).
Keith J. Miller, Newark, argued the cause for respondent (Robinson, Wettre & Miller, LLC, attorneys; Mr. Miller, on the brief).
Havkins Rosenfeld Ritzert & Varriale, LLP, attorneys for amicus curiae International Association of Venue Managers, Inc. (Jarett Warner, on the brief).
Before Judges CUFF, LIHOTZ and WAUGH.
The opinion of the court was delivered by
LIHOTZ, J.A.D.
We are asked to examine the scope of certain exemptions from the disclosure requirements set forth in the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. Defendant, the New Jersey Sports and Exposition Authority, appeals from an order requiring it to release unredacted copies of promoter licensing agreements for use of the IZOD Center, a State owned entertainment facility. A reporter employed by plaintiff, the Newark Morning Ledger Co., which publishes The Star-Ledger, filed an OPRA request seeking release of contracts between defendant and event promoters for performances held in the IZOD Center from 2007 to the date of the request, March 19, 2009. Defendant released copies of ninety-eight contracts, however the financial terms in the contracts were redacted. Defendant declined to release the full contracts, claiming the information was exempt from disclosure as proprietary financial information and because its release would create a competitive disadvantage or reveal trade secrets. Defendant also argued plaintiff's request sought confidential information, which was exempt from disclosure under common law.
Challenging the Law Division's order mandating the release of the unredacted documents, defendant seeks our review, offering the same arguments presented before the trial court and including a challenge to restrictions the trial court imposed on pre-hearing discovery.
Amicus, the International Association of Venue Managers, a not-for-profit tax exempt corporation consisting of venue operators across the country, supports defendant's position arguing the association favors "the protection and non-disclosure of confidential business contracts and other agreements that are negotiated with promoters, artists, agents, professional teams and numerous other licensees or lessees of assembly venues."
Having considered the arguments raised by the parties in light of the applicable law, we affirm. We conclude disclosure of the terms of the licensing agreements is mandated by OPRA. The redacted terms relating to the use of a state facility do not fall within the scope of "trade secrets" or "proprietary commercial or financial information" as used in N.J.S.A. 47:1A-1.1. Further, disclosure of the details regarding the licensing fees and other remunerative arrangements would not afford an advantage to other venues competing for bookings because they are widely known among those involved in this branch of the entertainment industry, defeating defendant's claims of confidentiality.

I.
Defendant was created by the State Legislature in 1971 to construct and operate "stadiums and other facilities for the holding of such spectator sports, expositions and other public events and uses," to "provide needed recreation, forums and expositions for the public" and "to accommodate *628 trade shows and other expositions in order to promote industry[.]" N.J.S.A. 5:10-2. Defendant's certificate of incorporation established it within the Department of Community Affairs as "a public body corporate and politic, . . . an instrumentality of the State exercising public and essential governmental functions[.]" N.J.S.A. 5:10-4(a). On behalf of the State, defendant operates several facilities, including the Meadowlands Sports Complex (consisting of the IZOD Center, the Meadowlands Racetrack, and the MetLife Stadium), Monmouth Park Racetrack, the Atlantic City Convention Center and Visitors Center (which manages Boardwalk Hall), and the Wildwoods Convention Center.
On March 16, 2009, Ted Sherman, a reporter working for plaintiff, transmitted a written OPRA request to defendant seeking:
1. All contracts with any concert or event promoter for any event held from Jan[uary] 1, 2007 to present. This would include any multi-year contracts signed before this date for events scheduled after January 1, 2007.
2. Any letters or e-mails to and/or from the Sports and Exposition Authority and any concert or event promoter from Jan[uary] 1, 2007 to the present, referencing the Prudential Center.
3. Any letters or e-mails to and/or from the Sports and Exposition Authority and any elected official referencing the future of the [IZOD Center] from Jan[uary] 1, 2005 to present.
Shortly thereafter, defendant responded. As to the first request, defendant agreed to produce the information "not [otherwise] exempt" by May 3, 2009, and provide the documents for the remaining requests by April 6, 2009.
On April 28, 2009, defendant released ninety-eight contracts it had executed with concert and event promoters leasing the IZOD Center for events. The modified documents blacken all financial terms, such as: licensing fees; obligations for payment of expenses; allocations of revenue generated from parking, ticket, concession, suite revenue and merchandise; ticket prices and other fees; terms regarding complimentary tickets and accommodations; and the name of the promoter executing the contract.
Explaining the basis for redacting the information, defendant stated:
The information that has been redacted is information that would either a) give an advantage to competitors or bidders, if disclosed; or, b) disclose trade secrets and proprietary commercial or financial information. You have inquired, specifically, about artist dressing room specifications. . . . If [defendant] is required to publicly disclose this information, it could result in an artist's refusal to perform at this venue, which certainly puts [defendant] and the arena at a competitive disadvantage to other private venues that can protect and respect the personal requests of the artists. It is our belief that disclosure of this information would have a chilling effect on the artists' willingness to perform at this arena in the future.
In an effort to avoid litigation, plaintiff requested defendant reassess its position and release unredacted records, asserting there was "no legal authority to withhold the requested contractual information from public disclosure under OPRA as proprietary or trade secret information." Further, plaintiff maintained there existed "no factual or legal basis for [the] assertion that release of basic financial information about the terms of [defendant]'s contracts would give an advantage to competitors or bidders." At defendant's request, plaintiff agreed to "refrain from *629 filing suit" while both sides attempted to resolve the dispute. These efforts were unsuccessful and plaintiff filed its verified complaint accompanied by an order seeking defendant to show cause why it "should not be compelled to produce" the entirety of the records requested.
In response, defendant interposed several defenses, including the assertion plaintiff's claims were barred by Rule 4:69-6(b)(3), and its requests were exempt by OPRA. To buttress the latter position, defendant filed largely identical certifications from several concert and event promoters, opposing the release of the redacted contract information, stating:
3. Throughout my negotiations and subsequent contractual agreements with the [defendant], I always believed and intended that the terms of each agreement and especially each performance and its requirements remain confidential. I never expected that the information within the agreements . . . [would] be released publicly.
4. I understand now that certain media outlets have requested as part of New Jersey's [OPRA] the contracts, addendums, and agreements made with [defendant] containing all of what I considered confidential information. I strongly oppose such a release.
5. If a release were made, I would be very reluctant in considering in the future whether to negotiate and sign any agreement with [defendant] because of the concern that such agreement would be subsequently made public. Both I and the performers that I represent, never intended this information to be made public.
6. The release of this information would greatly impact my impression of [defendant]. I would seriously consider alternative venues that would not release this type of information to the public.
7. To the best of my knowledge, contracts and agreements that I negotiate with other private venues are not made public and I have always insisted that the financial terms and conditions of any agreement on behalf of performers or artists I represent remain confidential.
Defendant also filed a certification from an Executive Vice President of Ticketmaster, which stated:
[O]ther venues in the [t]ri-[s]tate region that compete with [defendant] to attract concerts and other live entertainment events to their facilities would gain access to this previously confidential information and use this information to their competitive advantage in negotiating against [defendant] with artists' representatives and others. I further believe, based on my experience, that artists and event providers would be more inclined to stage their events at venues other than [defendant's] out of concern that their contractual arrangements with [defendant] would be made public.
Finally, Mark Stefanacci, defendant's Chief Operating Officer and General Counsel, opposed plaintiff's request, certifying that the Meadowlands Complex, which houses the IZOD Center, "continue[d] to outperform its competitive peers in the entertainment industry by setting attendance records and winning industry awards." Stefanacci asserted defendant "and its venues operate in a well known and fiercely competitive region and environment, and because of its public function it must remain competitive in order to provide tangible benefits to the citizens of the State." He explained the redacted information "would reveal the bargain and terms [defendant] offers to different promoters to bring entertainment to citizens of the State[,]" the release of which, he *630 believed, would enable "private entertainment venues [to] use the confidential financial information to gain an advantage over the IZOD Center by luring away promoters and entertainers with more lucrative agreements and terms." Stefanacci concluded defendant's efforts to book the IZOD Center would be "undercut[,]" resulting in a "chilling effect on the artists' and promoters' willingness to contract with [defendant]" for the venue, and eliminate its bargaining power when negotiating agreements, leading to a loss of revenue and ultimately causing the arena to shut down.
In an effort to further support its position that the industry generally considers promoter and artist financial terms of licensing agreements proprietary and confidential, defendant served subpoenas mirroring plaintiff's request seeking similar contracts on other arena facilities. Newark's Prudential Center had released two contracts,[1] but all other venues objected claiming the "documents were highly confidential and proprietary[,]" because disclosure would place the venue at a competitive disadvantage in the marketplace. Defendant also highlighted the fact that plaintiff's efforts to obtain information from these venues were similarly resisted.
Over defendant's objection, the court permitted limited discovery prior to the return date of the order to show cause. The court allowed "the deposition[] of a[t] least some of the promoters who submitted. . . certifications in order to delve into the basis for the conclusory statements in the certifications that public release of the information would cause a `competitive disadvantage.'"
Brian Gale, the Director of Booking and Marketing for Anschutz Entertainment Group (AEG), an on-site manager of the event calendar for the Prudential Center, was deposed. Gale explained the standard contract used by the Prudential Center does not contain a confidentiality clause because there is an expectation that the financial terms of the contract were confidential. He believed only promoters or someone seeking to rent the Prudential Center would have access to the fee information. Although the "base licensing fee" for use of the Prudential Center was known by promoters to be $75,000, he was unaware whether the IZOD Center had a similar standard fee. Without relating specific details, Gale explained there were other negotiated rates and terms in the contract with the artists or family-oriented events that were negotiated in addition to the base licensing fee.
Defendant also sought to depose Gordon Lavalette, the Executive Vice President of Finance and Administration of Devils Arena Entertainment, LLC (DAE), an owner of the Prudential Center. Prior to Lavalette's deposition, plaintiff moved to restrict the scope of inquiry. The court agreed in part, limiting defendant's questions to four areas:
(1) the decision to partially comply with the subpoena served on or about October 19, 2009; (2) why certain contracts were specifically produced; (3) whether there are other existing contracts; and (4) whether previous requests for entertainment contracts have been made by [plaintiff.]
Defendant was specifically precluded from asking Lavalette questions surrounding his understanding of plaintiff's motives for requesting the event contracts.
Lavalette stated he did not consider the information in the two released contracts confidential and would have no concern if a competitor obtained the information *631 regarding the base licensing fee or the event merchandising revenue split negotiated by the Prudential Center. However, he acknowledged there were more than two events held at the Prudential Center during the period covered by the subpoena, even though DAE only released two contracts in response to plaintiff's subpoena.
Brian Eric Kert, the Executive Vice President of Business and Legal Affairs for Live Nation Global Touring (Live Nation), explained Live Nation and AEG were the two largest concert promoters in the United States. Kert's division arranged world-wide tours for various performing artists. Kert noted that the kinds of terms that could be negotiated at various venues were generally known among the big concert promoters. However, the terms of each contract were never made public unless there was a lawsuit.
In discussing the factors considered when Live Nation contemplated whether to contract with a public venue for one of its artists, Kert stated the possibility of disclosure of the contractual terms is not "a positive factor attached to a venue[,]" yet it may still remain "advantageous" to book a public venue after considering "the location, the size of the venue . . . timing, [and] availability, all these factors go into" a decision to use a venue, which are "all probably going to trump confidentiality." Kert characterized the possible disclosure of the terms of a contract as "low down on your priority list[,] low down on your radar." This partly resulted from the fact that disclosure rarely occurred. Kert cautioned if disclosure happened routinely at a venue, the consideration would "be higher up on the radar."
Kert also discussed a Venue Rider he drafted and attached to agreements.[2] The Rider included certain financial terms specific to the venue and the artist. This Rider included a confidentially provision and Kert claimed he would not want any of those terms "going out into the public."
Plaintiff also deposed the Co-Chief Executive Officer of Metropolitan Talent, Inc., John Howard Scher, who described the changes he witnessed over the past twenty-five years in the manner concerts were promoted. Scher suggested disclosure of the contractual information would further exacerbate the already heavy competition between "the artists, the promoters and the facilities." Scher agreed there is some idea among promoters of what a facility may offer, but no one knows the specifics. He strongly objected to the release of the contractual information suggesting it would negatively impact local promoters like him, because if an artist knows another received a better package of compensation and perquisites, the artist would believe his or her promoter was incompetent.
Also deposed was Marla Ostroff, Executive Vice President of National Accounts for Ticketmaster, an automated event ticket seller and the exclusive ticket agent for defendant. Ostroff stated that if the terms of the agreement Ticketmaster negotiated with defendant were made public, it would harm its competitive position in the ticket industry.
Defendant deposed plaintiff's reporter, Sherman, and Deputy Managing Editor, David Tucker, inquiring as to the motive behind the OPRA request. Several questions posed during these depositions were met with objection, as Sherman and Tucker invoked the Reporter's Shield Law, *632 N.J.S.A. 2A:84A-21 (Shield Law)[3] and asserted the probe inappropriately scrutinized plaintiff's editorial processes and investigative techniques.
Near the close of discovery, plaintiff filed Sherman's certification, which attached eighteen unredacted concert or event contracts from other venues obtained utilizing public records requests. Defendant sought an order allowing it to resume Sherman's deposition regarding these documents or, alternatively, to bar their introduction. Defendant's motion was denied.
At a summary hearing, the trial court first addressed defendant's procedural challenge to the timeliness of plaintiff's action. Defendant maintained the action was filed one week beyond OPRA's forty-five day limitations period and should be dismissed. Judge Claude M. Coleman disagreed, determining the statute of limitations was tolled based upon plaintiff's forbearance pending the parties' attempted settlement, stating:
[A]s long as the parties were working or attempting to avoid litigation on the matter, I think that's a worthy goal. And even though it might not have been considered by [defendant] to toll the statute, I think it's not unreasonable for [plaintiff] to consider that . . . the statute would be tolled.
And . . . I do regard [this] as a very important public interest question and so I will relax the rules and allow the process to proceed, so that it is heard on the . . . merits[.][4]
Next, the parties addressed whether OPRA's exemptions shielded public review of the requested contracts. Following argument, the trial court reserved its decision pending an in camera review of the unredacted documents.
In a written opinion, Judge Coleman concluded defendant "failed to carry its burden" to show OPRA's exceptions applied "to the facts and circumstances in this case." Although certifications from concert promoters and venue operators were filed, the certifications were "nearly identical" and failed to "g[i]ve specific examples of what harm would occur if the contract information was released." Moreover, the deposition testimony of several affiants "conceded that disclosure of such information . . . would not be a de[c]isive factor in future contracts" negotiated with defendant.
Further, the trial court found "none of the requested contracts have a confidentiality provision" and the "general contract *633 terms are known throughout the industry and are certainly discussed between the promoters and the artists." Often, the "offer made by one venue is discussed with another venue, even before the contract is signed." Accordingly,
[n]o sensitive financial information is contained in the contracts. There are no expectations of privacy, and there are no rational reasons why disclosure of such information might cause [defendant] to lose its bargaining power in future agreements or provide a competitive disadvantage to [defendant]'s competition.
. . . .
. . . Defendant's argument that the release of the unredacted contract information would cause it immediate and irreparable harm on its face lacks merit. Such alleged harm has not been shown to this court.
The court noted defendant produced no authority to show what constituted a "competitive disadvantage" and no evidence explaining how the redacted information represented "trade secrets" or "proprietary information." Rather, "defendant . . . presented broad allegations of harm, unsubstantiated by specific examples of articulated reasoning."
In evaluating whether disclosure was warranted pursuant to the common law right of access to government records, the trial court discerned the "[c]ommon [l]aw right and statutory rights are not mutually exclusive." Moreover, the common law right of access "provides an even broader scope of documents than OPRA."
Finding plaintiff "made its request in good faith[,]" the court found there was a "strong public interest in disclosure of [defendant's] contracts[,]" which was "heightened by the political intrigue and dispute between the Prudential Center and [defendant]." In weighing "the public's interest in the right to know against the public interest in confidentiality of the contracts, the court [found] the public's right to know is paramount" because the "public has a right to [be] informed about a dispute involving its public agencies, and how it spends its money." The court ordered defendant to release "unredacted records and information reflecting: all contracts with any concert or event promoter for any event held from January 1, 2007 to present, and include[] any multi-year contracts signed before th[at] date for events scheduled after January 1, 2007."
When defendant failed to turn over the requested contracts, plaintiff moved to compel compliance with the October 25, 2010 order. Defendant filed a cross-motion for a stay of the order pending appeal. Plaintiff also requested an award of attorney's fees and costs as a prevailing party under N.J.S.A. 47:1A-6. Another motion judge[5] awarded plaintiff $126,135.95 in attorney's fees and costs.
This appeal ensued. Pending appeal, the trial court stayed both the October 25, 2010 order and the fee award.
On appeal, defendant raises procedural and substantive arguments. First, defendant suggests plaintiff's action should have been dismissed as time barred. Second, defendant argues the trial court erred in its interpretation of OPRA's exemptions. Defendant asserts disclosure is exempt as the information sought constitutes proprietary financial information and would result in a competitive disadvantage or disclosure of trade secrets. Third, defendant maintains the common law right of access is inapplicable here because the redacted information is confidential, making it exempt from disclosure. Finally, defendant *634 suggests the trial court abused its discretion by curbing defendant's discovery efforts regarding plaintiff's motive in obtaining the information.

II.

A.
We quickly dispel defendant's procedural assertions seeking to bar plaintiff's action. Defendant contends plaintiff "failed to file its action within the forty-five day time limit applicable to OPRA challenges" and presented "no justification" for enlarging the time to file its action under the "interests of justice" exception to Rule 4:69-6(a).
The Supreme Court has declared "OPRA actions have a 45-day statute of limitations, consistent with actions in lieu of prerogative writs." Mason v. City of Hoboken, 196 N.J. 51, 57, 951 A.2d 1017 (2008). See also R. 4:69-6(a). The forty-five day limitations period appropriately assures citizens receive "swift access to public records," and also provides public bodies with certainty regarding possible disputes regarding the accessibility of records. Mason, supra, 196 N.J. at 69-70, 951 A.2d 1017. The Court has also made clear trial "courts can enlarge that time period in the interest of justice," coincident with the provisions of Rule 4:69-6(c). Id. at 70, 951 A.2d 1017.
We concur with these legal conclusions. R. 2:11-3(e)(1)(A). Plaintiff's complaint was filed immediately after a brief period utilized for good faith settlement efforts, but six-days beyond the forty-five day limitations period. The delay was neither tactical nor designed to prejudice defendant, who was acutely aware of plaintiff's intention to press its claims in court. This latter fact is highlighted by defendant's June 8, 2009 correspondence requesting plaintiff to "refrain from filing suit against [defendant] while [the parties] tried to see if [they] could resolve the OPRA dispute without resorting to litigation." Although a formal extension was not sought, circumstances reflect defendant knew litigation was imminent.
Moreover, Judge Coleman relaxed the limitations period applying the interests of justice exception, R. 4:69-6(c), after finding "important public rather than private interests, which require adjudication or clarification." Borough of Princeton v. Bd. of Chosen Freeholders of the Cnty. of Mercer, 169 N.J. 135, 152, 777 A.2d 19 (2001) (quotation marks and citation omitted). Based on all the facts and circumstances presented, we conclude the trial court reasonably exercised its discretion in denying defendant's motion to dismiss plaintiff's complaint. See id. at 152-53, 777 A.2d 19.

B.
Turning to plaintiff's OPRA request and defendant's claimed exemptions precluding disclosure, our review "of whether access to public records under OPRA and the manner of its effectuation" are legal conclusions that are always subject to de novo review. Sussex Commons Assocs., LLC v. Rutgers, 416 N.J.Super. 537, 548, 6 A.3d 983 (App.Div.2010) (internal quotations and citations omitted), certif. granted, 205 N.J. 519, 16 A.3d 384 (2011). See also Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities, 207 N.J. 489, 493-94, n. 1 (2011) (stating we "need pay no deference to legal conclusions reached by the trial court").
In this undertaking, we are guided by the rules governing statutory interpretation. Primarily, "[i]n interpreting a statute, our role `is to determine and effectuate the Legislature's intent.'" Allen v. V & A Bros., Inc., 208 N.J. 114, 127, 26 A.3d *635 430 (2011) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553, 964 A.2d 741 (2009)). We are obligated to glean the Legislature's intention from the words of the statute, giving them their ordinary meaning. Burnett v. Cnty. of Bergen, 198 N.J. 408, 421, 968 A.2d 1151 (2009); see also N.J.S.A. 1:1-1 (stating a statute's "words and phrases shall be read and construed with their context" and "given their generally accepted meaning"). "To that end, `statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole.'" Burnett, supra, 198 N.J. at 421, 968 A.2d 1151 (quoting Bedford v. Riello, 195 N.J. 210, 224, 948 A.2d 1272 (2008)).
In our review, if we find
the language in a statute "is clear and unambiguous, and susceptible to only one interpretation," courts should not look "to extrinsic interpretative aids." Lozano v. Frank DeLuca Constr., 178 N.J. 513, 522 [842 A.2d 156] (2004) (citation and internal quotations marks omitted). However, "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, `including legislative history, committee reports, and contemporaneous construction.'" DiProspero[ v. Penn], 183 N.J. [477,] 492-93 [874 A.2d 1039 (2005)] (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 [861 A.2d 123] (2004)). Courts "may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result." Id. at 493 [874 A.2d 1039].
[Ibid.]
In enacting OPRA, the Legislature declared:
government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access . . . shall be construed in favor of the public's right of access[.]
[N.J.S.A. 47:1A-1.]
OPRA's paramount principle of "ready access to government records," Burnett, supra, 198 N.J. at 421, 968 A.2d 1151, is also reflected in N.J.S.A. 47:1A-5(e), which states: "Immediate access ordinarily shall be granted to budgets, bills, vouchers, contracts, including collective negotiations agreements and individual employment contracts, and public employee salary and overtime information." (Emphasis added).
OPRA was specifically designed "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Kovalcik v. Somerset Cnty. Prosecutor's Office, 206 N.J. 581, 588, 21 A.3d 1142 (2011) (internal quotations and citations omitted). "With broad public access to information about how state and local governments operate, citizens and the media can play a watchful role in curbing wasteful government spending and guarding against corruption and misconduct." Burnett, supra, 198 N.J. at 414, 968 A.2d 1151.
In crafting the statute, the Legislature included an expansive category of items[6] qualifying as a "government record," when "made, maintained or kept on *636 file in the course of . . . official business by an officer, commission, agency, or authority of the State or of any political subdivision." Ibid. N.J.S.A. 47:1A-1.1. The Legislature, however, recognized the "sweeping declaration" that all government records were subject to public access was "not unlimited" so "`the public's right of access [is] not absolute.'" Kovalcik, supra, 206 N.J. at 588, 21 A.3d 1142 (alteration in original) (quoting Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 284, 966 A.2d 1054 (2009)). OPRA lists twenty-one categories of information specifically excluded from the definition of government record. Ibid. Separately exempted are records of investigations in progress, N.J.S.A. 47:1A-3, and personnel and pension records, N.J.S.A. 47:1A-10. "Notably, if a document falls within one of these categories, it is not a government record and not subject to disclosure pursuant to OPRA." Commc'ns Workers of Am. v. Rousseau, 417 N.J.Super. 341, 355, 9 A.3d 1064 (App.Div.2010). Accord Tractenberg v. Twp. of W. Orange, 416 N.J.Super. 354, 366, 4 A.3d 585 (App.Div.2010).
Taken together, OPRA's provisions strike "a balance . . . between the competing interests of privacy and open government." Asbury Park Press v. Cnty. of Monmouth, 406 N.J.Super. 1, 11, 966 A.2d 75 (App.Div.2009), aff'd 201 N.J. 5, 986 A.2d 678 (2010). Accordingly, under OPRA, "all government records [shall] be disclosed upon request except those exempted by statute, legislative resolution, administrative regulation, executive order, rules of court, judicial decisions, or federal law." Id. at 6, 966 A.2d 75 (citing N.J.S.A. 47:1A-1, -9).
Furthermore, when a request for government records is made, OPRA "generally places the burden upon the custodian of a public record to state the `specific basis' for the denial of access[.]" Gannett N.J. Partners, LP v. Cnty. of Middlesex, 379 N.J.Super. 205, 215, 877 A.2d 330 (App.Div.2005) (quoting N.J.S.A. 47:1A-5(g)). See also N.J.S.A. 47:1A-6 (stating "[t]he public agency shall have the burden of proving that the denial of access is authorized by law"). In so doing, the reasons for withholding documents must be specific. Courts will "`simply no longer accept conclusory and generalized allegations of exemptions . . . but will require a relatively detailed analysis in manageable segments.'" Loigman v. Kimmelman, 102 N.J. 98, 110, 505 A.2d 958 (1986) (quoting Vaughn v. Rosen, 484 F.2d 820, 826 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974)).
There is no dispute the documents at issue fall within the definition of government records, unless excluded by one of the enumerated exceptions of N.J.S.A. 47:1A-1.1. The question for resolution is whether any of the cited exemptions protect these documents from disclosure. The exemptions pertinent to this dispute state:
A government record shall not include the following information which is deemed to be confidential for the purposes of [OPRA] as amended and supplemented:
. . . .
trade secrets and proprietary commercial or financial information obtained from any source. For the purposes of this paragraph, trade secrets shall include data processing software obtained by a public body under a licensing agreement which prohibits its disclosure;
. . . .
information which, if disclosed, would give an advantage to competitors or bidders[.]
[Ibid.]
*637 In our review, we "`must always maintain a sharp focus on the purpose of OPRA and resist attempts to limit its scope, absent a clear showing that one of its exemptions'" applies to bar the requested disclosure. Tractenberg, supra, 416 N.J.Super. at 378-379, 4 A.3d 585 (quoting Asbury Park Press v. Ocean Cnty. Prosecutor's Office, 374 N.J.Super. 312, 329, 864 A.2d 446 (Law Div.2004)).

1.
Here, defendant, relying principally on statements made by promoters during depositions, maintains it has only redacted information cloaked by the competitive advantage exclusion, arguing:
if disclosed, the information provides [defendant]'s competitors access to the specific, confidential financial terms individually negotiated for each event held at the IZOD Center. Armed with this information, [defendant]'s rivals could undercut and lure away [defendant]'s business by offering more favorable terms to prospective promoters/artists, resulting in the loss of revenue and [defendant]'s bargaining power in the industry.
Keying on the preservation of defendant's revenue through the maintenance of its bargaining position in the competitive entertainment industry, defendant predicts no promoter will utilize the facility unless afforded "the most favorable pricing terms previously offered" to another entertainer.
Amicus Association argues the agreements contain commercial and proprietary information because they "must have been developed and revised many times over [during] th[e] [thirty-] year period" since the IZOD Center opened. It also maintains the agreement terms were kept confidential by all parties because they were not released to the public and heavy emphasis must attach to this expectation of confidentially.
Plaintiff advances that the trial court's finding the competitive disadvantage exception does not apply must stand. It argues defendant's interpretation of the exclusion is "overly expansive[,]" which would "prevent the public from finding out basic contractual information about deals to rent the I[ZOD] Center[.]"
We touched on this exemption in Tractenberg, supra, finding it inapplicable to protect from release real estate appraisals obtained by the defendant municipality valuing a 120-acre parcel located in the Highlands. 416 N.J.Super. at 361, 378, 4 A.3d 585. The plaintiff taxpayer sought release of the appraisals to determine the value of the property in an effort to prevent further development. Id. at 360, 362, 4 A.3d 585. The defendant's brief objected on several grounds, which included the competitive disadvantage exception, but this issue was not argued before the trial court. Id. at 365, 4 A.3d 585. We rejected application of the exemption to the facts presented, which showed the defendant Township had the appraisals for over two years and had not commenced any negotiations to purchase the land, holding: "To contend that the mere potential for future negotiations, without a strong showing that negotiations are probable, satisfies the OPRA competitive advantage exemption `subverts the broad reading of OPRA as intended by the Legislature.'" Id. at 379, 4 A.3d 585 (quoting Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535, 874 A.2d 1064 (2005)). We therefore, rejected the defendant's argument that OPRA's competitive advantage exemption applied. Ibid.
In Rousseau, supra, we reviewed whether limited partnership agreements between the Division of Investment and private investment companies to create a *638 private equity fund using State employee pension deposits were subject to release under OPRA. 417 N.J.Super. at 348, 9 A.3d 1064. The Division asserted several OPRA exemptions allowed it to withhold the agreements with the private equity funds, including the competitive advantage exemption, primarily based on the harm to the private entities. Id. at 346, 9 A.3d 1064. The agreements under review contained
representations concerning the investment strategies and processes followed by the general partners [and] . . . the parameters within which the general partners of the funds must operate. . . . They set limits on the types of investments that may be made, the amount of capital that may be invested in the aggregate or in a particular transaction, and the length of time during which capital may be invested. . . . [The agreements] restrict the outside activities of the general partners[,] . . . limit the liability of the general partners and provide them with indemnification by the partnership for certain actions taken on behalf of the funds.
[Id. at 349, 9 A.3d 1064 (alterations in original).]
We considered the detailed affidavit filed by the Director in the trial proceeding explaining how each agreement "contain[ed] extensive provisions on the need for confidentiality," and "explicitly stat[ed] what information [could] be disclosed."[7]Id. at 359, 9 A.3d 1064. The Director also stated "private equity fund managers informed him that they would not accept the State as a limited partner if the terms of the agreement were subject to public disclosure." Id. at 351, 9 A.3d 1064. Further, the private fund managers filed certifications delineating why disclosure was prohibited. Ibid. We found the defendant's "expectation of confidentially [was] manifest," making disclosure unwarranted. Id. at 359-61, 9 A.3d 1064. Ultimately, the defendant's expectation of privacy was critical to this court when it found the investment agreements fell within the definitions of proprietary information and trade secrets. Id. at 359-62, 9 A.3d 1064.
The facts in this matter are considerably different than those in Rousseau. Aside from the one Venue Rider mentioned above, the IZOD Center agreements neither state they contain confidential information nor restrict disclosure of any terms. The documents reveal nothing about the business operations or financial strength of the promoters, they merely relate the terms negotiated with the State to use the facility. In fact, within the ten sample contracts, one included a disclaimer noting the possibility of disclosure stating: "The AUTHORITY will not release any box office or attendance figures to any entertainment papers such as Pollstar, Billboard, etc. Notwithstanding the above, due to the [OPRA], the AUTHORITY is required by law to release certain information if it is requested."
Unlike the limited partnership agreements in Rousseau, the variations in financial terms and conditions among performers' agreements likely resulted from the popularity of the talent rather than the proprietary strategies developed by the promoter. Similarly, defendant's professed fear that other venues, most specifically the Prudential Center, would undercut any given deal was contradicted by the testimony of promoters, who revealed they often shop geographically proximate arenas, *639 pitting one offer against another to get the best arrangement.
We also fail to grasp defendant's argument that release of its licensing fee, ticket share, merchandising and refreshment splits would allow its closest geographic competitor, the Prudential Center, to obtain a competitive advantage. The two venues differ in age, facility design, size, and other accommodations. More important, "artist preferences" for one facility over the other are predominately controlled by large international promoters like AEG which works with the Prudential Center, and Live Nation which works with defendant at the IZOD Center.
Further, the promoters' testimony revealed numerous facts influencing whether an artist would perform at a venue. Kert's testimony made this clear. Kert, who worked for Live Nation, enumerated the considerations for choosing a venue, testifying "availability, revenue, location,. . . [and] routing on the tour . . . are obviously important factors that are probably going to trump confidentiality." In fact, he acknowledged the possible disclosure of the terms of a contract with a public venue fell "low down on your priority list." Admittedly, he asserted routine disclosure of contract terms may become a consideration when contemplating a choice of venue, but it "certainly would not be the dispositive factor." These comments are a far cry from defendant's contentions that full disclosure would destroy its ability to negotiate and compete.
As a practical matter, we agree with defendant that specific information regarding an artist's accommodations during a performance are confidential because these details may contain security arrangements or include individual needs that reflect medical or dietary restrictions or account for other personal concerns unrelated to the business arrangement between defendant and the promoter, which in fact have a privacy interest attached.[8] However, we reject the general proposition that disclosure of the financial terms contained in the agreements is warranted to protect the artists' privacy, because they too are viewed as confidential. Interestingly, the confidentiality assertion on behalf of the performers is belied by defendant's revelation of the named artist, choosing instead to redact the name of the individual promoter. Defendant's claim is conclusory and the facility licensing agreement does not reflect the remuneration paid to an artist whose arrangement with a promoter is fixed by a separate document.
Finally, Scher's testimony revealed the terms and conditions for use of the IZOD Center are widely known among promoters, artists, ticket agents, and possibly other arenas. Promoters generally know what they can negotiate at various arenas or venues. In light of these facts, we perceive no reason why public scrutiny should be precluded.
Simply stated, we conclude defendant fails to identify the detrimental effects of disclosure. A broad assertion that disclosure will result in a loss of bargaining power is unsupported by actual evidence. Like Judge Coleman, we conclude defendant's claims fail to show the release of financial terms of the promoter/event contracts would give an advantage to defendant's competitors. Gannett, supra, 379 N.J.Super. at 215, 877 A.2d 330.

2.
Defendant next argues the "redacted portions of the contracts are further exempt *640 from disclosure under OPRA because they contain both proprietary financial information and trade secrets . . . [making them] confidential, and therefore, not subject to disclosure." Defendant contends "the specific financial terms contained in each individual contract entered into between [it] and the various concert[] promoters are valuable and private and have been treated as confidential by [defendant] and others within the entertainment industry." Defendant cloaks the financial terms as "trade secrets" because they are "privately owned and not communally shared." We are not persuaded.
As already noted, when reviewing the applicability of the competitive disadvantage exemption, indicia of confidentiality is not found: only one of the redacted contracts contained a confidentiality clause and the range of fees for use of the IZOD Center is generally known throughout the industry and discussed between promoters, arena managers, and performers. Promoters assertions, submitted in certifications or during deposition testimony, that the parties never intended the information to be made public cannot create an expectation of privacy.
In Rousseau, supra, we examined an OPRA exemption claim based on the proprietary commercial nature of the information sought. 417 N.J.Super. at 354, 9 A.3d 1064. We additionally determined whether the documents were trade secrets, and similarly excluded as government records. Id. at 360, 9 A.3d 1064.
Relying on the Court's guidance set forth in Lamorte Burns & Co. v. Walters, 167 N.J. 285, 299-301, 770 A.2d 1158 (2001), we considered "the key elements" to determine when commercial financial information was proprietary. Rousseau, supra, 417 N.J.Super. at 356, 9 A.3d 1064. Lamorte suggested we must analyze "the relationship of the parties at the time of disclosure[,] . . . the intended use of the information[,]" and "the expectations of the parties.", Ibid. (citing Lamorte, supra, 167 N.J. at 299-300, 770 A.2d 1158). "[U]nder OPRA, if the document contains commercial or proprietary information it is not considered a government record and not subject to disclosure." Id. at 358, 9 A.3d 1064. We concluded the investment agreements sought by the plaintiffs were proprietary as their content was not intended for wide dissemination, the "[d]efendants' expectation of confidentiality [was] manifest" and the agreements delineated the specific terms and specific persons who may review the information. Id. at 359, 9 A.3d 1064. Further,
[e]ach agreement contains specific information about the capitalization of the partnership, its commencement and termination date, and other information pertinent to the operational fortunes of the partnership. Finally, each agreement is a complex document. Each reflects years of experience and expertise by trained legal and financial professionals.
[Id. at 359-60, 9 A.3d 1064.]
In analyzing whether information qualifies as "trade-secrets," a term not defined by OPRA, id. at 360, 9 A.3d 1064, we considered the Court's prior reliance on Comment b of the Restatement of Torts § 757 (1939). Id. at 361, 9 A.3d 1064 (citing Hammock v. Hoffmann-LaRoche, 142 N.J. 356, 384, 662 A.2d 546 (1995)). The comment provides: "`[a] trade secret may consist of any . . . compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Ibid. (quoting Restatement of Torts § 757 cmt. b (1939)). Other considerations
include the extent to which the information is known outside of the owner's *641 business, the extent to which it is known by employees of the owner, the measures taken to guard the secrecy of the information, the value of the information to the owner and competitors, the effort expended to develop the information, and the ease or difficulty by which the information can be duplicated.
[Ibid. (citing Hoffmann-LaRoche, supra, 142 N.J. at 384, 662 A.2d 546).]
"`Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed.'" Trump's Castle Assocs. v. Tallone, 275 N.J.Super. 159, 163, 645 A.2d 1207 (App.Div.1994) (quoting In re Iowa Freedom of Info. Council, 724 F.2d 658, 662 (8th Cir.1983)).
Applying these standards, we conclude the facts at hand provide no parallels with those found in Rousseau. The IZOD Center licensing agreements amount to nothing more than form agreements, modified to identify the artist, performance date, the cost to rent the arena, and the exact financial deal struck. Dissemination of the information circulates beyond the IZOD Center's staff and is generally known throughout the industry by promoters, artists, their agents, ticket distributors, and concessionaires. No contractual safeguards limit disclosure of the alleged proprietary information or trade secrets. Instead, the agreements which represent deals struck with promoters on the types of fees and percentage splits for tickets, parking and items sold during a given event, appear to be replicated nationwide in similar venues.
Defendant offers no support for the contention that the information requested would release trade secrets. No evidence shows the redacted information was developed after expense of money and time, or was based on confidential marketing techniques or promotional research. The financial terms of each deal did not result from a methodology honed to attract desirable events to the facility, but merely as a product of negotiation with the individual promoter.
We do not accept defendant's suggestion that the unique circumstance of a government entity operating in an otherwise private industry expands the need for confidentiality and the exceptions to disclosure. Defendant's claim that disclosure diminishes its competitive edge is not clearly articulated. We remain at a loss to understand how disclosure of charges to a promoter who pays one fee for artist "B" and a different fee for artist "C" represents proprietary information warranting protection. Likewise, disclosure of a ticket revenue split for an artist represented by promoter "D" that varies with the ticket revenue split for a different artist represented by promoter "E" hardly seems a unique product of organizational or marketing strategy.
In short, defendant did not make a case for securing secrecy. See Apollo Techs. Corp. v. Centrosphere Indus. Corp., 805 F.Supp. 1157, 1202 (D.N.J.1992) (holding "[c]onclusory statements in affidavits declaring that information represents confidential business records and trade secrets" are "palpably insufficient" to prove such facts). The agreements are contracts for lease of a state-owned facility. The fact that the lease involves well-known entertainers will not shroud them in confidentiality. We agree with Judge Coleman's analysis that the financial terms contained in defendant's agreements are neither "trade secrets" nor "proprietary commercial or financial information." The terms are not subject to exclusion.

3.
Defendant's challenge to the trial court's January 21, 2011 award of attorney's fees *642 is based on securing reversal of the underlying order requiring release of the agreements. Defendant argues it "properly withheld the redacted information from disclosure under OPRA's competitive disadvantage and/or trade secrets and proprietary financial or commercial information exemptions." Our determination to the contrary deflates defendant's position. We conclude the trial court properly assessed reasonable attorney's fees to plaintiff as a prevailing party, pursuant to N.J.S.A. 47:1A-6. See Mason, supra, 196 N.J. at 70-71, 951 A.2d 1017 (discussing fee awards to a "prevailing party" under OPRA). The fee award will not be disturbed. R. 2:11-3(e)(1)(A).

C.
Defendant additionally maintains the redacted information is exempt from disclosure under common law. See Keddie v. Rutgers, 148 N.J. 36, 50, 689 A.2d 702 (1997). Defendant maintains when balancing the respective interests, "the public's interest in maintaining the confidentiality of this information to allow the IZOD Center to remain competitive in the market and continue to generate profits for the State far outweigh[s] any private right of access claimed by [p]laintiff." We disagree.
OPRA does not alter the common law right of access to government records. N.J.S.A. 47:1A-8. Accord Mason, supra, 196 N.J. at 67, 951 A.2d 1017. Although the "common-law definition of a public record is broader than the definition" contained in OPRA,[9] "the right to access common-law records is a qualified one." Keddie, supra, 148 N.J. at 49-50, 689 A.2d 702.
The common-law right to access public records depends on three requirements: (1) the records must be common-law public documents; (2) the person seeking access must establish an interest in the subject matter of the material; and (3) the citizen's right to access must be balanced against the State's interest in preventing disclosure.
[Id. at 50, 689 A.2d 702 (internal quotations and citations omitted).]
In balancing the asserted need for confidentiality against a requestor's alleged public interest seeking disclosure, a court considers:
(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
[Loigman, supra, 102 N.J. at 113, 505 A.2d 958.]
In its challenge to what it believes was a flawed analysis by the trial court, defendant *643 agrees the contracts are public records as defined under common law and does not dispute plaintiff has established a legitimate interest in seeking disclosure. See S. Jersey Publ'g Co. v. N.J. Expressway Auth., 124 N.J. 478, 487, 591 A.2d 921 (1991) (finding "a newspaper's interest in keeping a watchful eye on the workings of public agencies is sufficient to accord standing under the common law" (quotation marks and citations omitted)).
Defendant focuses its arguments on whether the balancing test asserting plaintiff's right to access is outweighed by the State's interest in maintaining confidentiality. Keddie, supra, 148 N.J. at 50, 689 A.2d 702. In doing so, defendant intimates plaintiff's request is not presented in good faith. See Phila. Newspapers, Inc. v. N.J., 232 N.J.Super. 458, 464, 557 A.2d 688 (App.Div.1989) (observing a citizen's request for access to confidential government materials must be made in good faith).
To prevail, defendant must show "the claim of confidentiality is `premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest.'" Keddie, supra, 148 N.J. at 51, 689 A.2d 702 (quoting Loigman, supra, 102 N.J. at 112, 505 A.2d 958). A slight interest in confidentiality, "standing alone" is insufficient to defeat "disclosure to advance a legitimate private interest." Ibid.
Applied here, we determine the release of unredacted contracts between defendant and promoters allows full public scrutiny of the proper use of government facilities, the defendant's administrative management of the IZOD Center, and the efficacy of expenditures for such purposes. The check on government allocation of taxpayers' dollars is highly significant. Allowing examination of the government contracts is designed to dispel rumors of possible preferential treatment or untoward favoritism at the public's expense, and also permits the public to monitor the efficient allocation of the State's limited resources.
This public interest must be weighed against defendant's interest, asserted on behalf of the citizenry, to maintain confidentiality of the documents. Id. at 49, 689 A.2d 702. Defendant suggests the trial court overlooked its need to avoid disruption of the arena's operation and its significant revenue stream. Further, defendant predicts disclosure will harm its competitive edge in the marketplace, compromising its "bargaining power in negotiating future financial terms in agreements" with prospective artists and promoters, causing detriment to the entire State and the closure of its venues.
On balance, defendant's forecast of financial peril is contradicted by the promoter's candor that the possibility of disclosure would be considered a factor whether to contract with defendant but not a deal breaker. The unique aspects of hosting events at the IZOD Center including its stadium character, capacity, multi-state draw and parking access, along with an artist's schedule and the availability of tour dates, rank much higher in the consideration of booking the facility than confidentiality of the facility lease terms.
Defendant further contends "[p]laintiff was serving as a proxy to the Prudential Center," motivated to "undermine the viability of the IZOD Center." This bald assertion is unaccompanied by any evidence and flies in the face of the Court's recognition that newspapers "keep a watchful eye" on the workings of government. S. Jersey Publ'g Co., supra, 124 N.J. at 487, 591 A.2d 921.
We again note, while seemingly not an issue regarding the contracts at issue, the personal accommodation requests of the *644 performers relating to security arrangements and dressing room and dietary requests shall remain confidential, as the only public interest in the personal habits or needs of performers is curiosity.

D.
The final issue presented is defendant's claim that the trial court abused its discretion by denying defendant the ability to obtain certain evidence during discovery. Defendant claims error resulted in the court's entry of the April 19, 2010 order, maintaining it did not require the owner of the Prudential Center to produce the remaining contracts subpoenaed in contemplation of Gordon Lavalette's deposition and, further, curtailed questions to Lavalette regarding his knowledge of plaintiff's motives. The second challenge identifies the June 11, 2010 order denying resumption of Sherman's deposition to "attack [his] credibility," following his late filing of a certification attaching contracts obtained in response to public records requests submitted to various other public venues. We are not persuaded.
When examining a trial court's exercise of discretionary authority, we reverse only when the exercise of discretion was "manifestly unjust" under the circumstances. Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J.Super. 141, 149, 920 A.2d 125 (App.Div.2007). "[I]t is not the appellate function to decide whether the trial court took the wisest course, or even the better course" as we do not substitute our judgment for that of the trial court. Gittleman v. Cent. Jersey Bank & Trust Co., 103 N.J.Super. 175, 179, 246 A.2d 757 (App.Div.1967), rev'd on other grounds, 52 N.J. 503, 246 A.2d 713 (1968). See also Abtrax Pharms., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 517, 655 A.2d 1368 (1995).
Judge Coleman determined defendant's proposed inquiries were irrelevant to substantiate its claim of the applicability of OPRA's competitive disadvantage or trade secrets exceptions. That determination recognizes "we do not consider the purpose behind OPRA requests," Burnett, supra, 198 N.J. at 435, 968 A.2d 1151, which are "generally immaterial to the disclosure determination[.]" MAG Entm't, LLC v. Div. of Alcoholic Beverage Control, 375 N.J.Super. 534, 543, 868 A.2d 1067 (App.Div.2005).
It is important to note OPRA matters must proceed "in a summary or expedited manner." N.J.S.A. 47:1A-6. Accordingly, discovery is limited. MAG Entm't, LLC, supra, 375 N.J.Super. at 552, 868 A.2d 1067.
We discern no basis to interfere with the trial court's orders and its rulings were not "manifestly unjust." Union Cnty. Improvement Auth., supra, 392 N.J.Super. at 149, 920 A.2d 125.

III.
Following our review of the issues raised on appeal, we conclude defendant has not met its burden to prove "the denial of access is authorized by law" under OPRA, N.J.S.A. 47:1A-6, or that the common law right to access has not been overcome by evidence of the public right to protect confidential information, except as to the limited information related to a performer's personal accommodations at the IZOD Center. Further, plaintiff's success on the merits was properly accompanied by an award of reasonable attorney's fees. Finally, we find no abuse of discretion in the trial court's entry of the pre-hearing discovery orders.
Affirmed.
NOTES
[1] The Prudential Center's response was to a subpoena issued by plaintiff.
[2] Among the ten sample unredacted contracts provided to the trial judge, one contains such a Venue Rider.
[3] Under N.J.S.A. 2A:84A-21, a person "employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public . . . has a privilege to refuse to disclose" the "source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered;" and "[a]ny news or information obtained in the course of pursuing his professional activities whether or not it is disseminated."
[4] The trial judge elaborated on this point stating:

The Rule allows relaxation in cases involving important and normal constitutional questions, or important public rather than private interests requiring adjudication and/or clarification. Adams v. DelMonte, 309 N.J.Super. 572[, 580-81, 707 A.2d 1061] (App.Div. 1998). This is such a case, which given the circumstances, [p]laintiff requested and was allowed time for further negotiations or a time for defendant to reconsider, not to gain time or an advantage, but to avoid litigation, unnecessary expenses and spare judicial resources. The Complaint was filed only six (6) days past the 45-day Rule [R. 4:69-6], and given the time and expense involving this matter, [p]laintiff's request was a reasonable one.
[5] Judge Coleman retired and another judge was assigned to the matter.
[6] By definition, a "government record" includes "any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof[.]" N.J.S.A. 47:1A-1.1.
[7] We noted "only four employees of the Division, in addition to the Director and Deputy Director and the Division's accountants and auditors, have access to the agreements." Id. at 350, 9 A.3d 1064.
[8] None of the sample contracts included in the record contained such information; however, it is clear terms of this nature are often negotiated.
[9] Under common law, a government record "is one that is made by a public official in the exercise of his or her public function, either because the record was required or directed by law to be made or kept, or because it was filed in a public office." Keddie, supra, 148 N.J. at 49, 689 A.2d 702.