**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2742-18T1

STEVEN MAKAI and
BECKY CHACKO,

     Plaintiffs-Appellants,

v.

WINSTON TOWERS
200 ASSOCIATION, INC.,
RCP MANAGEMENT
COMPANY, BHB INSURANCE
SERVICES, and BARBARA
LOMBARDI,

     Defendants-Respondents,

and

RAMESH MEHTA, J&Y
CONSTRUCTION COMPANY,
JACQUELINE CORDOVA
and/or JULIAN CORDOVA,
partners and owners, and
JULIAN CORDOVA,
Individually, and GREENWAY
PLUMBING AND HEATING CORP.,

     Defendants,

and

WINSTON TOWERS 200
ASSOCIATION INC.,

       Defendant/Third-Party
       Plaintiff-Respondent,

v.

BHB INSURANCE SERVICES
and BARBARA LOMBARDI,

       Defendants/Third-Party
       Defendants-Respondents,

and

RAMESH MEHTA,

       Third-Party Plaintiff,

v.

J&Y CONSTRUCTION
COMPANY, JACQUELINE
CORDOVA and/or
JULIAN CORDOVA,
partners and owners
and JULIAN CORDOVA
Individually,

       Third-Party Defendants.
_____

Argued November 9, 2020 – Decided  December 9, 2020

Before Judges Sabatino, Currier and Gooden Brown.

2

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0275-16.

Daniel Lebersfeld argued the cause for appellants (Franzblau Dratch, PC, attorneys; Brian M. Dratch, of counsel and on the briefs).

Michael T. Caufield argued the cause for respondents Winston Towers 200 Association, Inc. (Schepisi & McLaughlin, PA, attorneys; Michael T. Caulfield, on the brief).

Timothy E. Burke argued the cause for respondents RCP Management Company (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Timothy E. Burke, of counsel and on the brief).

Robert E. Campbell argued the cause for respondents BHB Insurance Services and Barbara Lombardi (White and Williams LLP, attorneys; Robert E. Campbell and Christopher P. Leise, on the brief).

PER CURIAM

This case concerns water leaks in a residential unit within a high-rise condominium building in Cliffside Park known as Winston Towers 200. The thirty-one-story building, one of two towers, was constructed in 1973 on the grounds of the former Palisades Amusement Park.

The complex is overseen by a condominium association, Winston Towers 200 Association, Inc. ("the association"). The association engages a separate firm, RCP Management Company ("RCP"), to manage the premises.

Plaintiffs Steven Makai and Becky Chacko bought Unit 1720 within Winston Towers in 2013. After they moved in, plaintiffs started to renovate their master bathroom. Their bathroom contractor noticed mold behind the walls, so plaintiffs retained a mold remediation expert, Charles Schwartz. Schwartz substantially traced the mold to water emanating from Unit 1820 directly above plaintiffs' unit. That upstairs unit is owned by Ramesh Mehta, who had been renovating his own bathroom.

Mehta's contractor, J&Y Construction Company, attempted to repair the leaks, but mold spots returned in Unit 1720. Concerned about the mold spots for health reasons, Makai temporarily vacated the premises until the mold and water problem was finally abated. Makai claims he lost income because he was not able to work from home during the time the mold persisted.

Plaintiffs sued Mehta, J&Y, the condominium association, its management company RCP, and various other parties for negligence in failing to act reasonably to prevent the mold and water infiltration. The association named its insurance broker, BHB Insurance Services and claims manager Barbara Lombardi, as third-

4

party defendants for failing to procure mold coverage.[1] Extensive discovery overseen by the Law Division ensued.

Eventually plaintiffs settled with Mehta and J&Y for an undisclosed sum. They are now pursuing the association and RCP for additional damages.

Plaintiffs argue the association had a duty to warn them about latent mold and water leakage behind the walls. They contend such a duty is consistent with this court's opinion in Siddons v. Cook, 382 N.J. Super. 1 (App. Div. 2005) (holding that a condominium association, based on its knowledge of widespread problems, had a duty to warn unit owners that dishwasher hoses in their units were prone to leaks).

To support their causation argument that the water infiltrated their unit from common areas within the association's purview, plaintiffs rely upon the report of their expert, Schwartz. In that regard, they note Schwartz's hypothesis that the leaks may be attributed, at least in part, to long-standing "historical" water problems within the tower. Plaintiffs also attempt to rely upon expert opinions of Robert Strode, an industrial hygienist who had originally been retained by Mehta. In his expert report prepared for Mehta before the settlement, Strode opined the water leaks in Unit 1720 predominantly did not come from Mehta's unit above.

---

[1] Because of the trial court's dismissal of claims against the association, the court never needed to address the viability of those coverage claims.

The trial court granted the association and RCP summary judgment. Among other things, the court found plaintiffs lacked what it deemed to be a necessary expert on building management practices. The court also found plaintiffs had no expert showing, with an appropriate evidential foundation, that the cause of the leaks to Unit 1720 stemmed from any common areas in the building.

Although it did not need to reach damages issues, the court dismissed plaintiffs' claims for lost income and bodily injury damages. It imposed those sanctions upon plaintiffs for failure to cooperate in discovery in scheduling a physician's deposition and obtaining requested tax records.

Plaintiffs now appeal, mainly arguing that the trial court erred in concluding their claims against the association and RCP lack sufficient expert support. They further argue the court misapplied its discretion in imposing severe discovery sanctions against them on the damages issues.

For the reasons to follow, we affirm the summary judgment order. Although we disagree with certain aspects of the trial court's analysis, we likewise conclude plaintiffs have not marshalled sufficient expert support to establish the leaks to their unit originated in common areas. Consequently, plaintiffs have no viable claims against the association and RCP. Because of that failure to establish liability, we need not grant any relief as to the damages-related discovery sanctions.

A-2742-18T1

I.

Familiar principles guide our analysis of the trial court's summary judgment order. Summary judgment "must be granted if 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting R. 4:46-2(c)).  The court must decide whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995).  We review de novo the grant or denial of a motion for summary judgment.  Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 349-50 (2016).

A.

To perform our review, we first consider the legal framework for plaintiff's claims against the association and its management firm, RCP.

A condominium association is composed of unit owners, N.J.S.A. 46:8B-9, -12, -12.1, and "is responsible for the administration and management of the condominium." Siddons, 382 N.J. Super. at 6 (App. Div. 2005) (citing N.J.S.A.

46:8B-8, -12).  An association's operations are informed by the Condominium Act, N.J.S.A. 46:8B-1 to -38, as well as the contents of the master deed and the condominium by-laws.  Siddons, 382 N.J. Super. at 6 (citing N.J.S.A. 46:8B-13, -14, -15).

By statute, a condominium association is responsible for the "maintenance, repair or replacement of any common elements therein or accessible therefrom or for making emergency repairs necessary to prevent damage to common elements or to any other unit or units."  N.J.S.A. 46:8B-15(b) (emphasis added).  A unit owner nevertheless remains liable "for injuries or damages resulting from an accident in his own unit in the same manner and the same extent as the owner of any other real estate."  N.J.S.A. 46:8B-16(c) (emphasis added).

Here, the By-Laws and Master Deed for Winston Towers 200 reiterate this important distinction between common areas and private unit areas.  The overall administration, management, maintenance, repair, and operation of the Winston Towers 200 building is governed by the By-Laws of the association.  Section 3 of the By-Laws, which governs damage to the property, provides:

> If the damage is only to those parts of one Apartment Unit for which the responsibilities of maintenance and repair are those of the Unit Owner, then the Unit Owner

shall be responsible for reconstruction and repair after casualty.

[(Emphasis added).]

The property rights of the association and the owner of each residential unit within Winston Towers 200 are further governed by the Master Deed. The Master Deed defines the term "Apartment Unit" as follows:

> (d) "Apartment Unit" shall mean a part of the Building designed and intended for independent use as a private dwelling and shall consist of the interior walls and partitions which are contained within the private dwelling and shall also consist of the inner decorated and/or finished surfaces of the perimeter walls, floors and ceilings, including dri-wall [sic], paint, wallpaper, etc. contained in the dwelling, as shown on the Survey, but shall not mean any part of the Common Elements situated within the Apartment Units.

[(Emphasis added).]

The Master Deed defines "Common Elements" as follows:

> (f) "Common Elements" shall consist of all parts of the Property other than the Apartment Units, including the items set forth in the Condominium Act, and the rights of the Association pursuant to the Additional Recreational Facilities Agreement annexed hereto and made a part hereof as Exhibit A, subject to the terms, provisions, conditions and charges thereunder.

[(Emphasis added).]

A-2742-18T1

The Master Deed provides that each unit owner "shall furnish and be responsible for, at his own expense, all of the maintenance, repairs and replacements within his own Apartment Unit," which include "the refrigerators, ranges and other kitchen appliances and lighting fixtures and other electrical appliances and plumbing fixtures . . . ." In contrast, the Master Deed provides that the maintenance, repairs and replacements to be made to the Common Elements "shall be furnished by the Association as part of the common Expenses."

In addition, a fellow unit owner—such as Mehta here—may be liable for causing damage to either (1) common areas or (2) the apartments of other unit owners in the building. As the Master Deed specifies:

> If, due to the negligent act or omission of a Unit Owner, or of a member of his family or household pet or of a guest or other authorized occupant or visitor of such Unit Owner, damage shall be caused to the Common Elements or to an Apartment Unit or Apartment Units owned by others, or maintenance, repairs, or replacements shall be required which would otherwise be at the Common Expense, then such Unit Owner shall pay for such damage and such maintenance, repairs and replacements to the Common Elements or the Apartment Units . . . .
>
> [(Emphasis added).]

B.

The functions of the association in the present case were substantially delegated to RCP, which the association hired in January 2008 to serve as its Managing Agent. A management agreement between RCP and the association defined RCP's duties to the association and its members. That agreement delineates RCP's obligations to unit owners as follows:

> The Managing Agent <u>shall maintain businesslike relations with condominium unit owners and with all tenants and residents of the Condominium, all of whose service requests and complaints shall be received, considered, acted upon, and recorded systematically, showing the action taken with respect to each</u>. Requests deemed by the Managing Agent to be unreasonable, outside the scope of its responsibilities or those of the Association, or those of a serious nature, shall, after thorough investigation, be reported to the Board with appropriate recommendations.
>
> [(Emphasis added).]

Regardless of any contract it may have with a management firm, the governing body of a condominium association "has a fiduciary obligation to the unit owners 'similar to that of a corporate board to its shareholders.'" <u>Siddons</u>, 382 N.J. Super. at 7 (quoting <u>Kim v. Flagship Condo. Owners Ass'n</u>, 327 N.J. Super. 544, 550 (App. Div. 2000)). Condominium association board members are required to "act reasonably and in good faith in carrying out their duties."

Jennings v. Borough of Highlands, 418 N.J. Super. 405, 421 (App. Div. 2011) (quoting Papalexiou v. Tower West Condo., 167 N.J. Super. 516, 527 (Ch. Div. 1979)).

To sustain a cause of action for negligence against a condominium association, like any other negligence claim, "a plaintiff must establish four elements: '(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008)).

"Whether a duty exists is a matter of law, to be decided by the court, not the factfinder." Siddons, 382 N.J. Super. at 8 (citing Rogers v. Bree, 329 N.J. Super. 197, 201 (App. Div. 2000)). When determining the existence of a duty, courts consider fairness, public policy, and foreseeability of injury to others from a defendant's conduct. Snyder v. Am. Ass'n of Blood Banks, 144 N.J. 269, 292 (1996).

In Siddons, the key case plaintiffs rest upon in alleging the association's liability, we illustrated how these concepts of duty and negligence operate. There, the plaintiff's condominium unit was flooded by water from a broken dishwasher hose in another unit. Id. at 5. The condominium association was aware that similar hoses had previously broken and caused flooding in other

units. Ibid. The trial court granted the association's summary judgment motion, finding it owed no duty to warn the plaintiff about the potential flooding hazard. Ibid. We reversed.

Although the plaintiff in Siddons conceded that the dishwasher was not a common area the association was responsible for maintaining, we reasoned that "under some circumstances the knowledge of a dangerous condition, regardless of control over that condition, may impose upon a person a duty to warn third parties of the danger. Those circumstances exist here." Id. at 10. Before the flooding incident in Siddons that damaged the plaintiff's unit, the association had been notified on "at least three occasions that the dishwasher hoses that had been installed by the original developer caused flooding to other condominium units." Id. at 11. This information was not known by most of the unit owners. In that particular factual setting, we held it would not have been unreasonably burdensome for the association to have a duty to notify the unit owners about the hazard. Ibid. Consequently, we vacated summary judgment in Siddons and remanded the matter for a trial. Id. at 14.

Tracking these principles, plaintiffs contend the association had a fiduciary duty to "preserve and protect the common elements and areas for the benefit of all of its members," and failed to do so here. According to plaintiffs,

13

two expert opinions concluded that water infiltration into their unit came from the common elements of the building, which the association and RCP are responsible for by statute and contractual agreement.

Plaintiffs cite in this regard to a history of water infiltration in the building dating back to as early as 1998, fifteen years before they moved into the unit, where there was leaking associated with the curtain wall windows in unspecified other units. Plaintiffs also point to water intrusion in the building from a water main leak during boiler replacement work in 2013, as well as previous mold testing between 2009 and 2011 that was a "repeated" topic of discussion at board meetings between 2010 and 2012.

## C.

In the first part of its summary judgment analysis, the trial court ruled that plaintiffs could not pursue their negligence claims against the association and RCP because they did not retain an expert witness on condominium association management practices. Under the circumstances presented here, we disagree that such an expert is vital to support these negligence claims alleging unreasonable conduct or lack of action.

As a general matter of evidence law, N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact

to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education <u>may testify</u> thereto in the form of an opinion or otherwise."  (Emphasis added).

Expert testimony "should not be permitted unless it concerns a subject matter that is 'so distinctively related to some science, profession, business or occupation as to be <u>beyond the ken of the average layman</u>.'"  <u>Jacobs v. Jersey Cent. Power & Light Co.</u>, 452 N.J. Super. 494, 505 (App. Div. 2017) (emphasis added) (quoting Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 1 on N.J.R.E. 702 (2017)).  Expert testimony is not necessary when the jury can understand the concepts in a case "utilizing common judgment and experience."  <u>Ibid.</u> (quoting <u>Campbell v. Hastings</u>, 348 N.J. Super. 264, 270 (App. Div. 2002)); <u>see also</u> <u>Mayer v. Once Upon A Rose, Inc.</u>, 429 N.J. Super. 365 (App. Div. 2013) (holding that an expert to opine on the physical properties of glass was not required to support plaintiff's claim that a defendant negligently held a glass vase and caused it to shatter).

By contrast, "expert testimony is required when 'a subject is so esoteric that jurors of common judgment and experience cannot form a valid conclusion.'"  <u>Hopkins v. Fox & Lazo Realtors</u>, 132 N.J. 426, 450 (1993) (quoting <u>Wyatt by Caldwell v. Wyatt</u>, N.J. Super. 580, 591 (App. Div. 1987));

see also Ford Motor Credit Co., LLC v. Medola, 427 N.J. Super. 226, 239 (App. Div. 2012) (requiring a qualified expert to opine on esoteric issues involving a complex instrumentality to determine why car engine seized).

In Jacobs, 452 N.J. Super. at 497, a negligence case, we ruled that the plaintiff was not required to retain an expert to establish the standard of care of a public utility company when the plaintiff fell in a hole in the ground left by the utility for two months after performing electrical repairs. We rejected the defendant's argument that a jury could not determine without an expert whether its actions were negligent, because as a public utility company it was heavily regulated by the State. Id. at 506. We reasoned, "[a]lthough electrical power is undoubtedly a complex and technical subject matter that often would call for expert insight, [the] plaintiff in this case was not harmed by an electrical shock or surge. She simply fell into . . . a hole in the ground, a hole which the jurors reasonably found to have been left unattended too long." Id. at 508 (emphasis added). The jury was readily capable of determining without expert assistance whether the utility company acted negligently by leaving a hole in the ground for two months with no durable warning signs on the ground by the plaintiff's home. Id. at 507. A basic standard of reasonable care was sufficient to guide the jurors. Ibid.

Here, that same basic standard of reasonableness likewise could be applied by jurors to defendants' conduct in light of their common judgment and experience. If, as plaintiffs allege, the leaks into their unit were caused by water infiltration from common areas, and the association and RCP had reason to be aware of such persisting hazards, the jurors would be capable of evaluating whether those defendants were unreasonable in failing to do anything about the problem. It is not an "esoteric" question.

In fact, there is no indication in <u>Siddons</u> that the plaintiff in that case retained an expert on condominium management practices. Nor did our opinion in <u>Siddons</u> say that such an expert was required to show the association had been unreasonable. We therefore part company with the trial court in its declaration that such an expert was required here. To be sure, plaintiff's case might have been strengthened by calling such an expert, but one was not absolutely necessary.

D.

That said, the expert deficiency that does sink plaintiffs here concerns not proving breach of a duty, but causation. We agree with the trial court that plaintiffs failed to establish, with appropriate expert opinion, that the damage in

17

their unit was caused by water leaks from common areas. Plaintiffs' reliance on the expert reports of Strode and Schwartz is unavailing, for several reasons.

We begin with Strode. As we have noted, Strode was retained by defendant Mehta in an effort to try to show the water and mold in plaintiffs' unit was not caused, or substantially caused, by water leaking from Mehta's upstairs unit. Strode is a certified industrial hygienist "with a background in evaluating the workplace and environment for potential hazards with regard to work practices, measuring and evaluating exposures to various substances, and determining and controlling the nature and extent of health risks in occupational settings." In his expert report, Strode states he is familiar with "the evolution of knowledge with respect to fungi (aka mold) in the field of industrial hygiene." He is not an engineer.

Strode concluded in his report that "[a]lthough Unit 1820 has also had Property-related water intrusions over the years, there was no indication that any water originating from Unit 1820 had entered Unit 1720 prior to or after September 2014, when it was alleged that water originated from the master bedroom shower in Unit 1820 dripped into Unit 1720 during the remediation activities [in Unit 1720]." His report further noted that "[a]lthough there appeared to be some historical leaking associated with the curtain wall windows

in Unit 1720, it did not appear that Mr. Makai, Ms. Chacko, or EASI requested or performed any investigation or remediation under or around the exterior wall where the windows were located." Along those lines, "[t]he Association board meeting documents . . . support the presence of historical curtain wall window leaks [in the building] and that consultants were hired as early as 1998 to investigate the cause of the leaks."

Strode further opined in his report "[t]he water intrusion, if any, originating in Unit 1820 would have been de minimis and insufficient to have been a substantial factor in the water intrusion and/or potential fungal growth in the interstitial spaces of the Unit 1720 walls . . . ." Instead, Strode stated "Unit 1720 apparently experienced numerous long-standing historical water intrusion events and at least one significant water intrusion event associated with a water main leak during boiler replacement work in 2013." He added, "[t]he conditions observed in the interstitial spaces during invasive investigation and remediation . . . indicate that long-standing and/or significant water intrusion events were the cause of the fungal growth in these areas."

As a threshold procedural question, we agree with the trial court that plaintiffs did not have the right to call Strode as their own expert witness after they consummated a settlement with Mehta. That is because the deadline for

plaintiffs to designate additional expert witnesses under the court's case management orders had expired more than three months earlier.

The pertinent chronology is as follows. On September 28, 2017 the trial court ordered that "the discovery end date [("DED")] in this matter is January 29, 2018." About a month later, on October 30, 2017, the court issued a superseding management order requiring plaintiffs to serve all expert reports by December 17, 2017. The court thereafter entered an order on December 15, 2017 extending the DED to May 1, 2018.

Plaintiffs received a further extension of time for their experts on January 5, 2018, when the court issued an order mandating that "plaintiff[s] shall exchange expert reports." On April 13, 2018, the court issued another extension order, specifying "that defendants shall serve any and all expert reports, in response to any expert report timely served by plaintiffs by February 16, 2018, on or before June 1, 2018." (Emphasis added). In a fifth case management order issued on June 11, 2018, the court ordered that "in the event that any defendant or third-party defendant should timely serve an expert report, between July 2, 2018 and August 1, 2018, that . . . [the parties] shall have until September 1, 2018 to serve an expert report responding to that defendant or third-party defendant's report."

A-2742-18T1

In their earlier answers to interrogatories, plaintiffs identified Schwartz, their mold remediation consultant, as an expert witness on liability. Plaintiffs also reserved the right to supplement their response as to which experts they intended to rely upon at trial.

On May 1, 2018, plaintiffs' counsel wrote a letter to counsel for the Association, RCP, and BHB, announcing that plaintiffs "reserve[d] the right to call Robert D. Strod[e] as an expert at the time of trial in this matter," and accordingly "amend[ed] answers to interrogatories to include same." Notably, plaintiffs did not tender an amended report from Strode. Instead, they simply relied on the report he had originally prepared for Mehta in fending off plaintiffs' claims of Mehta's responsibility.

During the oral argument on the summary judgment motions, the trial court disallowed plaintiffs from using Strode as their own expert, under a premise that plaintiffs had not retained him. We are not sure if that premise is correct. Plaintiffs were not required to present to the court a retention letter or other documentation confirming that Strode had agreed to serve as their expert and the terms of that retention.

We will presume that the May 1 letter from plaintiffs' counsel was based upon a good faith representation that Strode had agreed to testify for plaintiffs.

21

The problem, as we have noted, is that the deadline for plaintiff to designate additional expert witnesses had already lapsed in February, after multiple extensions. The trial court is afforded wide latitude in managing pretrial discovery. Abtrax Pharms., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 513 (1995). In order for that oversight to be successful, the parties must adhere to the deadlines specified in case management orders. Appellate courts generally will not interfere with discovery and pretrial case management rulings unless it is demonstrated that the trial court abused its discretion. Id. at 517.

Given the chronology here, we are unpersuaded the trial court abused its discretion in ruling that plaintiffs could not rely on Strode as their own expert. It appears that plaintiffs originally targeted their efforts in this case heavily against Mehta, arguing that water had leaked into their unit from Mehta's due to his renovation activities. Strode's expert report was generated as part of Mehta's defense of those allegations, and plaintiffs' original liability expert Schwartz apparently did not amend his report to address any of Strode's opinions.

It was not until after plaintiffs achieved a settlement with Mehta did they pivot, in essence, their liability focus to the association and RCP. Their adoption of Strode's report as part of that late shift was after the court's specified deadline, and hence too late.

A-2742-18T1

We are aware that <u>Rule</u> 4:17-7 provides that except as otherwise provided by <u>Rule</u> 4:17-4(e), "if a party who has furnished answers to interrogatories <u>thereafter obtains information</u> that renders such answers incomplete or inaccurate, amended answers shall be served <u>not later than</u> 20 days prior to the end of the discovery period, as fixed by the track assignment or subsequent order." This provision did not entitle plaintiffs to disregard the February 2018 deadline for their expert reports and belatedly expand their expert designations in May 2018 without the court's permission.

We are mindful that defendants had already received Strode's report from Mehta's counsel and would not have been surprised by his opinions. Nonetheless, the late designation of Strode as part of plaintiffs' case-in-chief was never sanctioned by the trial court, and we will not interfere with that case management decision.

Even, assuming, for the sake of discussion, we were to reverse the trial court's procedural ruling as to Strode, the content of his report and his qualifications and methodology fall short in supporting plaintiffs on the critical issue of causation. These deficiencies likewise pertain to plaintiffs' expert

Schwartz, whose opinions on causation the trial court expressly and soundly rejected, for the reasons we now explore.[2]

Schwartz has been certified by the American Council for Accredited Certification as a microbial consultant, as well as an indoor environmental consultant, indoor air quality consultant, and microbial remediation supervisor. Like Strode, Schwartz is not an engineer.

Plaintiffs initially retained Schwartz to take air samples of their unit. Schwartz inspected the unit in July 2014. He found evidence of mold on the surface of the inside of the wall cavity between plaintiffs' hall bathroom and the common-area hallway. He also detected mold spores "in low concentrations" in the master bedroom and master bathroom.[3]

During their investigation of the source of the water infiltration, building maintenance staff located an active leak in the wall of the master bath of Unit 1720, which they concluded was likely causing water to flow through the wall of plaintiffs' bathroom into the wall space next to it. A mold remediation project thereafter was undertaken in August 2014.

---

[2] Our discussion is confined to the contents of the liability experts' reports, as there were apparently no expert depositions taken.

[3] The record on appeal does not contain a copy of the mold test report.

A-2742-18T1

In September 2014, after plaintiffs' contractor had gutted both bathrooms, it discovered water dripping through an opening in the slab between Unit 1720 and the unit above, Unit 1820. Chacko reported this new leak to RCP's office. The leak was identified immediately above the space between the common-area hallway and the hall bathroom of Unit 1720, which adjoins the wall space between the hall bathroom and the master bathroom. Building maintenance staff suspected the water in Unit 1720 was coming from a bathroom upstairs in Unit 1820.

The maintenance staff contacted Mehta and obtained his cooperation in conducting a test to confirm that his shower was the source of the water infiltration in Unit 1720. The workers opened up the wall outside of Unit 1820 in order to pinpoint the source of the leak into Unit 1720. They concluded the leak into Unit 1720 was coming from Unit 1820. Accordingly, repairs to the upstairs unit were conducted, and the reconstruction and remediation of plaintiffs' unit were completed.

In October 2015, Schwartz's firm issued a post mold remediation clearance report, confirming there was no more evidence of mold in Unit 1720. However, Makai asked the firm to return to look for "any other mold issues." Schwartz's company did so in November 2015 and found moisture in the floor

in a hallway and in two rooms, as well as evidence of water damage on a wall near the kitchen exhaust shaft. These findings indicated the initial repairs and remediation had been inadequate.

Schwartz recommended further mold remediation, which was performed by the same contractor who had conducted the first remediation project. Thereafter, Schwartz's firm did further mold tests and concluded that air throughout plaintiffs' unit now "met clearance criteria."

Schwartz issued an expert report in connection with this litigation in February 2018. Among other things, his report concluded that "our moisture and assessment services identified several separate mold growth impacted areas in apartment 1720 which were caused by historical building system leaks pre-existing to and not caused by the residents of apartment 1720, Mr. Makai and Mrs. Chacko."

The trial court found such conclusory assertions to be inadequate to support plaintiffs' causation arguments against the association and RCP. Accordingly, the court dismissed plaintiffs' claims for lack of competent expert proof of causation.

On appeal, defendants echo the court's reasoning. They argue that Schwartz, a mold specialist who is not an engineer, lacks the qualifications to

attribute the cause of the water damage in plaintiffs' unit to systemic water infiltration in this massive building. They further contend Schwartz's attribution to such systemic causes emanating from common areas is an inadmissible "net opinion," noting that he did not perform testing with a proper methodology that could determine such causation. We agree.

A fundamental element of any negligence case is proximate causation. Rappaport v. Nichols, 31 N.J. 188, 203 (1959); Camp v. Jiffy Lube No. 114, 309 N.J. Super. 305, 309-11 (App. Div. 1998). Here, establishing such causation is a complicated, "esoteric" task, which requires the admissible opinions of a qualified expert. Wyatt, 217 N.J. Super. at 591.

We do not question Schwartz's credentials as a highly qualified mold specialist. But his expertise is inadequate to provide a jury with an appropriate evidential foundation to conclude that the leaks in this case originated from common areas in the building. He did not rely on the building's engineering records or plans, even though they were made available to him. He and his company made no expert observations of water presently leaking through the windows or migrating from common elements during the time frame of plaintiffs' problems. The only testing done by Schwartz's firm, as indicated by

in the report, was to detect the presence of mold in the air and surfaces, not to trace water flow through the building.

Similar deficiencies are patent in Strode's analysis. Although Strode has extensive credentials as an experienced industrial hygienist with a master's degree in microbiology, he too is not an engineer.[4] He did not perform forensic testing that could establish, with a proper methodology, that the water in plaintiffs' unit originated from common elements. In fact, Strode never inspected the site. He confined his expert report to a review of documents and transcripts. Cf. Townsend, 221 N.J. at 57 (in excluding a causation expert under the net opinion doctrine, the Court noted the expert "took no measurements" and "did not apply his engineering expertise to present empirical evidence" that supported the plaintiffs' liability theory).

Strode's conclusion, like that of Schwartz, that the leaks in plaintiffs' unit were the result of historical water infiltration within the building are inadmissible net opinion.

---

[4] See N.J.S.A. 45:8-28(b) (defining the profession of engineering to entail "the application of special knowledge of the mathematical, physical and engineering sciences to such services [as] . . . [the] investigation, evaluation, planning and design of engineering works and systems, planning for the use of land and water . . . in connection with any engineering project including . . . structures [and] buildings").

A-2742-18T1

The doctrine barring the admission of net opinions is a "corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (alterations in original) (quoting Polzo, 196 N.J. at 583). The net opinion principle requires that experts "give the why and wherefore" supporting their opinions, "rather than . . . mere conclusion[s]." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Experts must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). An expert's conclusion should be excluded "if it is 'based merely on unfounded speculation and unquantified possibilities.'" Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). "[A] trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record." Ibid. (emphasis added); see also Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 401 (2014); Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011).

In the present case, we agree that plaintiffs have not presented competent expert opinion, based upon a sound methodology, to support their theory of causation against the association and RCP.[5] Consequently, we affirm summary judgment in favor of those defendants.

## II.

We need not reach plaintiffs' arguments concerning the discovery sanctions, as they relate solely to damages.

All other points raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We are mindful the record contains documents showing the building has had numerous problems of water leaks during its three-decade history, and that the association's board minutes reflect concerns about leaks in past years. Nonetheless, such lay and anecdotal proof is not sufficient to support plaintiffs' claim that the damage to their own unit was proximately caused by water leaking from common areas. Proper expert support was vital.